**In re J.I.R. aka J.C.**

**Appeal of L.C.**

Superior Court of Pennsylvania.

Submitted April 15, 2002.
Filed Sept. 17, 2002.
Reargument Denied Nov. 14, 2002.

Raymond D. Roberts, Philadelphia, for appellant.

Katrina R. Durham, Philadelphia, for Department of Human Services.

Before TODD, BENDER, and TAMILIA, JJ.

TAMILIA, J.

¶ 1 Mother, L.C., appeals the July 6, 2001 Decree terminating her parental rights as to her minor child, J.I.R.

¶ 2 The Philadelphia Department of Human Services (DHS) first became involved in L.C.'s family situation in January 1988. Eleven years into DHS's involvement with L.C.'s family situation, on October 6, 1999, DHS was contacted by a Philadelphia hospital's emergency room and informed that L.C. had given birth to J.I.R., a boy, born prematurely and who tested positive for cocaine at birth.[1] In addition, DHS discovered that L.C. lacked appropriate housing. The child remained in the hospital for approximately two months due to his medical conditions and then was placed in foster care, where he has remained since that time. On December 3, 1999, the child was adjudicated dependent.

¶ 3 The record reveals that L.C. was incarcerated sometime shortly after the child's birth and that she is serving a one to three year term of imprisonment for a drug related offense. The evidence indicates L.C. was eligible for parole in November 2001. Further, we note that L.C. has attached, as an exhibit to her appellate brief, a copy of a document purportedly issued by the Pennsylvania Board of Probation and Parole on August 30, 2001. The document indicates that L.C. was scheduled to be paroled on or about November 1, 2001. As this document is not a part of the certified record, this Court is precluded from considering it or any effect it might have upon the issue of whether termination of L.C.'s parental rights was appropriate. "This Court may only rely on what appears in the certified record." *Bennyhoff v. Pappert*, 790 A.2d 313, 317 (Pa.Super.2001). *See also Frank v. Frank*, 402 Pa.Super. 458, 587 A.2d 340, 342, n. 5 (1991) ("For purposes of appellate review, what is not of record does not exist").

¶ 4 A family service plan (FSP) was developed and the goal set forth therein called for reunification of the child with L.C. In order to achieve this goal, the FSP set forth the following objectives with which L.C. was instructed to comply.

- Secure and maintain safe and adequate housing;
- Maintain visitation with the child;
- Learn parenting skills, including non-physical methods of discipline;

---

1. Department of Human Services (DHS) case worker, Dawn George, testified that, in addition to testing positive for cocaine, the baby was "severely premature" at birth and suffered medical conditions related to his premat- ture birth. N.T. 7/6/2001, at 11. Moreover, the record reveals that, as a result of his medical conditions, the child has serious developmental problems.

- Comply with the directions and requests of DHS and affiliated agencies; and
- Inform DHS of her whereabouts.

DHS's Petition for Goal Change to Adoption and Involuntary Termination of Parental Rights, Exhibit A., ¶ e. In addition, the FSP directed L.C. to obtain and maintain employment and substance abuse treatment. *See* N.T. 7/6/01 at 14.

¶ 5 L.C. was invited to attend both FSP meetings; however, she failed to attend or otherwise participate in either meeting. On September 4, 2000, after having found L.C. failed to take steps necessary to comply with the above described objectives, DHS petitioned for a change of goal from reunification to adoption and filed a petition for termination of L.C.'s parental rights pursuant to 23 Pa.C.S.A. § 2511, **Grounds for involuntary termination.**

¶ 6 Following a July 6, 2001 hearing, the family division, juvenile branch, entered its Decree terminating L.C.'s parental rights pursuant to 23 Pa.C.S.A. § 2511(a) **General rule** (8).[2],[3] On appeal, L.C. challenges the termination of her parental rights and argues the evidence fails to support the court's findings and conclusions.

■ ¶ 7 " 'The standard of review in cases involving the termination of parental rights is limited to the determination of whether the orphans' court's decree is supported by competent evidence.' " *In re Adoption of J.D.S.,* 763 A.2d 867, 870 (Pa.Super.2000), *quoting In re Julissa O.,* 746 A.2d 1137, 1139 (Pa.Super.2000).

¶ 8 As the party seeking termination, DHS bore the burden of establishing, by clear and convincing evidence, that grounds existed for terminating L.C.'s parental rights. " 'The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue.' " *In re Adoption of C.A.W.,* 453 Pa.Super. 277, 683 A.2d 911, 914 (1996), *appeal denied,* 548 Pa. 631, 694 A.2d 619 (1996), *quoting Matter of Sylvester,* 521 Pa. 300, 304, 555 A.2d 1202, 1203–1204 (1989).

■ ¶ 9 In pertinent part, 23 Pa.C.S.A. § 2511, **Grounds for involuntary termination,** provides:

(a) **General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . .

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

---

**2.** Initially, DHS petitioned for termination of L.C.'s parental rights pursuant to 23 Pa.C.S.A. § 2511, **Grounds for involuntary termination** (a) **General rule** (1), (2), (5) and (8). Thereafter, DHS abandoned its position with respect to termination pursuant to subsections (1) and (2) and put forth evidence in support of termination pursuant to subsections (5) and (8). While there appears to be some discrepancy in the record, our review of the record makes clear the court granted the involuntary termination of parental rights petition with respect to only subsection (8).

**3.** As provided in Pa. Const. Article 5, Schedule to Judiciary Article § 16 q(iii) (Philadelphia), "[t]he court of common pleas through the family court division of the court of common pleas shall exercise jurisdiction in the following matters: . . . (iii) Adoptions and Delayed Birth Certificates."

¶ 10 Above all else in determining whether parental rights should be terminated, adequate consideration must be given to the needs and welfare of the child. *In re Child M.,* 452 Pa.Super. 230, 681 A.2d 793 (1996), *appeal denied,* 546 Pa. 674, 686 A.2d 1307 (1996).

¶ 11 The evidentiary hearing was held on July 6, 2001. Dawn George, a DHS social worker, and Henry Ortiz, a Delta Community Services caseworker, testified in support of DHS's petition. L.C., who was represented by counsel, participated via telephone from S.C.I. Muncy. We have carefully reviewed the notes of testimony and now set forth a detailed summary of the evidence presented.

¶ 12 George, who was assigned to the case in December of 2000, testified regarding the circumstances of the child's birth and his medical problems related thereto. George also testified that L.C. failed to fulfill the objectives of the FSP. George indicated that because of L.C.'s incarceration, she had not attended any of the FSP meetings. With regard to the change in goal, George explained that the involuntary termination of L.C.'s parental rights as to other children was considered to be an aggravated circumstance. George also indicated that, at the time of the hearing, the child was twenty-one months old, had resided with his foster mother since his release from the hospital and had developmental problems requiring medical care with which the foster mother was able to assist.

¶ 13 On cross-examination, George acknowledged she received correspondence from L.C. and was aware that L.C. participated in alcohol and drug treatment while incarcerated. George also stated L.C. had asked about a facility near the prison where she could have some interaction with the child and that she had received correspondence from an attorney regarding that foster care agency. George also conceded that L.C. had not indicated that she wished to relinquish her parental rights.

¶ 14 Ortiz, who had been assigned to J.I.R.'s case only one month prior to the hearing, testified about the placement of the child and the Individual Service Plan (ISP), the objectives of which, including L.C.'s contact with Delta and her visitation with the child, had not been met. He testified regarding the child's medical treatment, the foster mother's ability to comply with Delta's requirements in caring for the child and that he believed that adoption by the foster parent was in the best interest of the child.

¶ 15 On cross-examination, Ortiz acknowledged that neither he nor the previous caseworker had any contact with L.C. He stated that the file contained letters of introduction, one from himself and one from the previous caseworker, that advised L.C. that she was invited to ISP meetings; however, Ortiz indicated that the letters were sent to an address in Philadelphia, not to the prison where L.C. was incarcerated. Thus, the ISP was formulated without any input from L.C. Moreover, Ortiz did not indicate whether the goals in the ISP were ever communicated to or discussed with L.C.

¶ 16 L.C. testified she had applied for parole and expected to be released from prison in November 2001. L.C. further testified about the programs and classes she successfully completed while incarcerated. She also explained her contact with a Ms. Dalton, the director of the foster care agency near the correctional facility, to whom L.C. spoke about temporary custody for the child for the period of time until she was released and able to care for him herself. L.C. explained she wrote several letters to George about her attempts to arrange the temporary custody and

about the classes she was taking in prison, but never received any response from George. L.C. also requested photographs of and visits with the child. She testified she was informed that the judge denied these requests. L.C. also testified she signed letters sent by Delta, granting permission for the child's treatment, but that she was not provided with a contact person from that agency.

¶ 17 On cross-examination, L.C. acknowledged that since the child was born, she has been incarcerated for all but a month or two. She also admitted she did not seek drug and/or alcohol treatment during that time. L.C. testified she was aware of some of the child's medical problems, but that other than a parenting/child development course, she had not been trained to deal with his medical needs.

 ¶ 18 We begin by noting the following rule with respect to the rights of a parent who is or has been incarcerated.

[I]ncarceration of a parent does not, in itself, provide sufficient grounds for termination of parental rights; however, an incarcerated parent's responsibilities are not tolled during his incarceration. Parental rights may not be preserved by waiting for some more suitable financial circumstance or convenient time for the performance of parental duties and responsibilities. Further, parental duty requires that the parent not yield to every problem, but must act affirmatively, with good faith interest and effort, to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances.

*In the Interest of C.S.*, 761 A.2d 1197, 1201 (Pa.Super.2000) (internal quotations and citations omitted.)

¶ 19 Upon review of the record, we find L.C.'s incarceration was not a significant factor in terminating her parental rights and that the court gave due consideration to the evidence L.C. presented indicating she made efforts to improve herself while incarcerated.

¶ 20 Next, we look to see whether undue consideration was given to the fact that L.C. has had her parental rights involuntarily terminated with respect to other children. The record reveals L.C. had her parental rights terminated as to five (5) other children, not including the child in this case and that these terminations were decreed in 1994 and 1996.

¶ 21 Pursuant to the requirements of the federal Adoption and Safe Families Act of 1997 (ASFA), Pennsylvania amended its Juvenile Act, 42 Pa.C.S. §§ 6301 – 6365, effective January 1, 1999. Included in the amended Juvenile Act, "aggravated circumstances" can be found where, *inter alia,* "[t]he parental rights of the parent have been involuntarily terminated with respect to a child of the parent." 42 Pa. C.S.A. § 6302, **Definitions.**

¶ 22 The issue of whether previous involuntary terminations of parental rights should be considered to be an aggravated circumstance in evaluating the need to make reasonable efforts to return a child to his or her parent[s] was addressed by this Court in *In re R.T.,* 778 A.2d 670 (Pa.Super.2001), *appeal denied,* 568 Pa. 618, 792 A.2d 1254 (2001). The *In re R.T.* court held that consideration of terminations which were decreed prior to the effective date of the 1998 amendments to the Juvenile Act constituted an impermissible retroactive application of the statute.[4]

**4.** On September 4, 2000, DHS petitioned for a change of goal from reunification to adoption and filed a petition for termination of L.C.'s parental rights pursuant to 23 Pa.C.S.A. § 2511, **Grounds for involuntary termination.** Over eight months later, on May 22, 2001, this Court handed down its decision in *In re*

¶ 23 This is not to say that prior terminations are not to be considered at all in evaluating the evidence with respect to termination of parental rights. While prior terminations are clearly not dispositive of whether parental rights should be terminated in the future, they are clearly relevant factors in determining whether a parent's current assertions that he or she is capable of providing proper parental care to the child are credible.

¶ 24 Here, the record indicates that previous terminations of L.C.'s parental rights to other children were considered by DHS to be an aggravated circumstance. The court, without employing the aggravated circumstance terminology, merely found that L.C.'s rights to five other children had been involuntarily terminated, albeit prior to the effective date of the amended Juvenile Act. The court could not ignore this unremitting history of inadequate parenting even though it would not trigger, presumptively, involuntary termination based on the ASFA legislation.[5]

¶ 25 This Court feels compelled to note that DHS should have conducted its program differently in the present case. Due to L.C.'s incarceration, we find DHS should have taken appropriate steps to ensure L.C. received direct notification of all relevant matters. Further, a more adequate response should have been made to L.C.'s requests for information regarding temporary custody arrangements she had sought and photographs of and visits with the child. Despite these shortcomings and the fact that the previous terminations were considered to be aggravated circumstances, however, we do not find DHS failed to do its part in facilitating the goals of the FSP. The overwhelming and inescapable evidence established a total failure of parenting by L.C. for all of her children, now totaling six in number. Her inability, failure and incapacity to provide a functioning home with appropriate care for any of them provides no basis upon which the court could perpetrate a plan entailing reasonable effort for reunification of J.I.R. with L.C. The failure of L.C. began before the birth of J.I.R., who the record establishes was cocaine addicted and premature with physical deficiencies at birth. To embark on what can only be described as an experiment in desperation upon

R.T., 778 A.2d 670 (Pa.Super.2001), *appeal denied*, 568 Pa. 618, 792 A.2d 1254 (2001).

5. The legislative history of the Adoption and Safe Families Act provides in pertinent part as follows:

 There seems to be a growing belief that Federal statutes, the social work profession, and the courts sometimes err on the side of protecting the rights of parents. As a result too many children are subjected to long spells of foster care or are returned to families who reabuse them.

 The bipartisan group that wrote this legislation recognized the importance and essential fairness of the reasonable efforts criterion. What is needed is not a wholesale reversal of reasonable efforts or of the view that government has a responsibility to help troubled families solve the problems that lead to child abuse or neglect.... Rather than abandoning the Federal policy of helping troubled families, what is needed is a measured response to allow States to adjust their statutes and practices so that in some circumstances States will be able to move more efficiently toward terminating parental rights and placing children for adoption. Thus, the Committee bill would require States to define "aggravated circumstances," such as ... chronic abuse, or sexual abuse, in which States are allowed to bypass the Federal reasonable efforts criteria and instead would be required to make efforts to place the child for adoption. In addition, States would be required to bypass reasonable efforts to provide services to families if the parent ... has another child for whom parental rights were involuntarily terminated.

 House Report No. 105–77, April 28, 1997, Cong. Record Vol. 143 (1997), "Purpose and Scope," Page 8.

J.L.'s release from prison would place J.I.R. in jeopardy, and can only be described as unconscionable. While the criterion of aggravated circumstances was not applied in this case, as the previous involuntary terminations occurred prior to the effective date of the ASFA's application in Pennsylvania law, the rationale upon which Congress based the justification for such a provision speaks clearly to its need and the prior practice that produced concern.

¶ 26 Upon careful and independent review of the record, we find many factors that are more significant and had a far greater influence on the court's decision with respect to termination of L.C.'s parental rights than the previous involuntary terminations. Further, we find the record replete with support for our conclusion the court weighed heavily the needs and welfare of the child in determining termination of L.C.'s parental rights was appropriate. The record indicates the child has been in placement almost all of his life and that his special needs are being met by his foster parent. Moreover, the evidence indicates L.C. has not and can not, within a reasonable amount of time, remedy those problems that made initial placement of the child necessary.[6]

¶ 27 Finding the court's determination is supported by competent evidence, we affirm the Decree.

¶ 28 Decree affirmed.

---

**6.** A major portion of appellant's argument was that the court's Findings of Fact and Conclusions of Law were based on matters raised sua sponte and on sections of 2511(a) which were not alleged, while the court terminated parental rights on section 2511(a)(8) alone (which was alleged). This argument is specious as appellant relies on criminal cases which turn on specific counts in a complaint which must be alleged and proven beyond a

Dissenting Opinion by BENDER, J.

¶ 1 I respectfully dissent. I believe that the Department of Human Services (DHS) failed to establish by clear and convincing evidence that the termination of L.C.'s parental rights is warranted based on the record before this Court. Moreover, I would conclude that the lower court's decision does not adequately explain that it considered the totality of the circumstances and explanations given by L.C. as required in *In re K.B.,* 763 A.2d 436, 439 (Pa.Super.2000) (stating that "the family court must examine the totality of circumstances and consider all explanations offered by the parents" in light of the fact that "at stake is the termination of rights with constitutional significance"). Furthermore, because I would so conclude, I do not believe that this Court is able to reach the separate consideration of the best interest of the child as explained in *In re B.L.L.,* 787 A.2d 1007, 1013–14 (Pa.Super.2001) (stating that "the best interest of the child is not the first and only consideration. The court must initially find that the statutory requirements for termination of parental rights have been met.... The needs and welfare of the child are a discrete consideration to be determined only after the statutory requirements for termination have been met.")

¶ 2 Initially, the Majority recognizes that incarceration alone does not provide sufficient grounds for termination, but that the parent must act affirmatively to the best of his or her ability. However, the

reasonable doubt, whereas in this proceeding, the agency can allege a number of grounds for termination pursuant to section 2511, *Grounds for involuntary termination,* and the reviewing court "need to only concur with the trial court's decision as to any one subsection in order to affirm the termination of parties' parental rights." *In re J.E.,* 745 A.2d 1250 (Pa.Super.2000).

Majority then states that "[u]pon review of the record, we find L.C.'s incarceration was not a significant factor in terminating her parental rights and that the court gave due consideration to the evidence L.C. presented indicating she made efforts to improve herself while incarcerated." Majority *op.* at 938. In reviewing the lower court's decision I do not find any indication that such consideration was given. The court's entire decision states as follows:

### FINDINGS OF FACT

1. On July 6, 2001, a goal change/involuntary termination hearing was held before Honorable Nicholas M. D'Alessandro in Courtroom "E," 1801 Vine Street, Philadelphia, PA 19102, to terminate the parental rights of mother and father in the above-captioned matter.

2. The subject of the termination hearing was J.I.R., a/k/a J.C. ("child"), who was born October 6, 1999, in Philadelphia, Pennsylvania.

3. The mother never visited, planned for or provided financial assistance to child. Mother's parental rights have been involuntarily terminated with reference to five other children.

4. The putative/natural/presumptive father never visited, planned for or provided financial assistance to nor has he had any involvement with this child.

5. Testimony presented indicated that J.I.R., a/k/a J.C. was born positive for cocaine, severely premature with medical conditions and as a result, this child has serious developmental issues.

6. The child was adjudicated dependent on December 3, 1999. The child has been in foster care since the age of three months where he still remains to the present and the foster mother wishes to adopt.

7. Dawn George, DHS Social Worker and Henry Ortiz, Delta Community Supports Social Worker both testified at the hearing of July 6, 2001, that it would be in the best of interests of this child to be adopted.

### CONCLUSIONS OF LAW

1. The child has been without essential parental care, control and subsistence necessary for his physical and mental well-being.

2. Under the Juvenile Act, 42 Pa. C.S.A. Sec. 6351 and 55 Pa.Code Sec. 3140.74, the disposition best suited to the protection and physical, mental and moral welfare of the above-named child is Adoption.

3. The basis for terminating the parental rights of the parents of this child are established by the following: 23 Pa. C.S.A. Sec. 2511(a)(1), (2), (5), and (8).

These Findings of fact and conclusions of Law shall serve as my Opinion in the matter.

Trial Court Opinion (T.C.O.), 7/6/01.

¶ 3 Although the lower court does not mention L.C.'s incarceration, it also does not in any way even allude to any evidence L.C. presented about efforts she made to improve herself while in prison. The court failed to acknowledge L.C.'s assertions that she successfully completed parenting classes and attended substance abuse treatment during her incarceration. No mention was made that L.C. attempted to have J.I.R. relocated to an agency near the correctional facility so that she could visit with her son and participate in the planning for his development. In fact, the Majority also notes DHS's failure to take "appropriate steps to ensure L.C. received direct notification of all relevant matters" and DHS's lack of a response to "L.C.'s requests for information regarding temporary custody arrangements she sought and

photographs of and visits with the child." Majority op. at 939.

¶ 4 I find other aspects of this case troubling, including the failure of case-workers to attempt to involve L.C. in the meetings where the goals for reunification were formulated and dismissing L.C.'s non-attendance simply by stating she was incarcerated.[7] Also of concern is DHS's forbearance for only nine months from the dependency adjudication to the determination to seek a goal change from reunification to adoption, Ms. George's inability at the hearing to provide documentation from the agency's file, and substantial reliance as an aggravating circumstance on the fact that L.C.'s rights to other children had been terminated.

¶ 5 Although I am not convinced that the agencies involved deliberately obstructed L.C.'s efforts to comply with the family service plan goals and her attempts to rehabilitate,[8] I am also cognizant of the fact that prisons offer the various rehabilitative programs to encourage those incarcerated individuals to learn to undertake their proper place in society and fulfill their role as parents. By emphasizing the termination of L.C.'s parental rights to other children and not acknowledging her successful completion of the prison programs, the message sent to L.C. and others in her circumstances is clearly that "we have given up on you, so do not even bother."

¶ 6 The Majority finds and I agree that prior terminations of parental rights are a factor that a court should consider, but again both caseworkers' testimony and what appears as significant reliance by the lower court emphasizes this factor in this case almost to the exclusion of everything else. Furthermore, I am at a loss to explain the abbreviated opinion issued by the lower court. Finding of Fact No. 3, stating that "mother never visited, planned for or provided financial assistance to child," is the only finding that directly impacts the statutory requirement "that conditions which led to the removal or placement of the child continue to exist...." 23 Pa.C.S. § 2511(a)(8). This statement does not acknowledge L.C.'s incarceration, and could be defined as a conclusion of law, which, quite simply, I believe is inadequate to explain the court's decision to terminate a parent's right to her child, a right that has "constitutional significance." *K.B.* Without an in-depth explanation about what facts the lower court relied upon, I believe the Majority steps into the shoes of the court that is responsible for determining facts and credibility. The decision here is based on inferences the Majority draws from the record without the benefit of knowing whether the lower court properly weighed the facts presented to it.

¶ 7 Finally, because I believe that DHS failed to carry its burden of proving by clear and convincing evidence that L.C.'s parental rights should be terminated and also because the lower court failed to consider L.C.'s testimony or explain what evidence it relied upon, I would reverse the decree issued in this matter.

---

7. The Majority only indicates that L.C. was invited to but failed to attend family service plan meetings. Majority op. at 936.

8. *See In re Baby Boy H.,* 401 Pa.Super. 530, 585 A.2d 1054 (1991) (obstructive tactics on the part of the social agency will excuse failure perform parental duties).