**In re Termination of Rights of D.A. and L.W.**

*Carole J. Walbert,* for Carbon County Children & Youth Services.
*Mark E. Combi,* for E.M.W.
*Brian B. Gazo,* for L.W.

NANOVIC, *P.J.,* January 8, 2009—The respondent, L.W. (Mother), in the above-captioned termination proceedings has appealed from our order dated October 6, 2008, terminating her parental rights in her son, E.M.W. (child).[1] For the following reasons, it is respectfully requested that Mother's appeal be denied and that the final decree be affirmed.

## FACTUAL BACKGROUND

The final decree entered on October 6, 2008, sets forth both the legal and factual basis for the involuntary termination of Mother's parental rights. Those findings reflect, inter alia, the following.

The child, who is the subject of these proceedings, was born on June 15, 2006 and is now two years old. At the time of his birth, he was taken directly from the hospital by the petitioner, the Carbon County Children and Youth Services Office (hereinafter referred to at times as CYS and at times as the agency), and immediately placed in

---

1. The natural father's parental rights were terminated by final decree dated April 8, 2008. The father has not appealed from that decree.

protective custody. The agency was concerned that the child was in immediate danger of being abused based upon information it had received of severe sexual abuse of the child's older brother, Jacob, by Mother and his biological father, between January 2005 and September 8, 2005. Jacob, who was born on February 5, 2001, was removed from Mother's home on September 8, 2005.

As part of the family service plan for Jacob, Mother was required to obtain a sexual offender's evaluation and follow all recommendations thereof and also to obtain a mental health evaluation and receive counseling as recommended. These goals remained in place at the time of the child's birth and had yet to be complied with by Mother.

A mental evaluation took place in October 2005 and recommended counseling. Mother failed to make arrangements for counseling. Again in October 2006, mental health recommended counseling and Mother failed to make the necessary arrangements. When Mother finally appeared for an intake interview in October 2007, it was determined that she would not benefit from counseling because of impaired judgment and limited insight. Consequently, the request for counseling did not proceed further.

Mother had two sexual offender's evaluations. The first occurred on April 25, 2006, approximately two months prior to the child's birth. Weekly treatment was recommended. When Mother failed to attend scheduled appointments and to make any efforts to pay the costs of the counseling, she was unsuccessfully discharged in July 2006. (N.T. 9/19/08, p. 10; N.T. 9/30/08, p. 20.)

The second evaluation occurred in February 2008, following CYS' referral to Forensic Treatment Services on September 25, 2007. On October 25, 2007, Forensic Treatment Services contacted Mother to schedule an intake appointment. Because of delays attributable to Mother, the evaluation requested in September 2007 did not occur until February 2008.

As part of the evaluation process performed by Forensic Treatment Services, a polygraph examination was administered. In a pre-test interview, Mother admitted that she was aware that Jacob's father sexually abused him and she did nothing about it. (N.T. 9/19/08, pp. 64-65.) In a post-test interview, Mother admitted that she herself had sexually abused Jacob on two separate occasions. (N.T. 9/19/08, p. 66.)

Based upon Forensic Treatment Services' evaluation, Mother was once more recommended for weekly sexual offender's treatment. Again, as previously, she failed to keep appointments and to make an effort to pay the costs. In March 2008, she was discharged and designated by Forensic Treatment Services as an untreated sexual offender. This status placed her at a high risk for re-offense. Forensic Treatment Services recommended that she have no contact with children under 18 years of age, including her own children. (N.T. 9/19/08, p. 13.)

On September 28, 2006, Mother pled guilty to a charge of endangering the welfare of children with respect to Jacob. She received a sentence of no less than nine nor more than 23 months in prison, with 30 days credit. In accordance with this sentence, she was in prison from January 22, 2007 through August 18, 2007. (N.T. 9/30/08,

p. 18.) While in prison, CYS did not permit any visits between Mother and the child to occur.

Prior to Mother's imprisonment on January 22, 2007, supervised visits between the child and Mother occurred every other week between June 2006 and January 2007. These visits resumed following Mother's release from prison in August 2007 and continued until February 2008 when Forensic Treatment Services found Mother was an untreated sexual offender and recommended that she not be in contact with children until treatment was successfully completed. For this reason, no visits have occurred between Mother and child since February 2008.

The child's entire life to date has been in foster care. He has never lived with his mother and Mother has never provided for any of his physical, emotional, or developmental needs. Mother has not been an active participant in the child's life and there exists no close parental ties or emotional bonds between the two.

The petition for involuntary termination was filed on February 7, 2008. It identifies three grounds for termination: 23 Pa.C.S. §2511(a)(1) (abandonment); section 2511(a)(2) (neglect); and section 2511(a)(5) (placement for a period of six months or more with no reasonable likelihood of reunification within a reasonable period of time). Hearings on the petition were held on September 19, 2008 and September 30, 2008. The findings of fact contained in the final decree dated October 6, 2008, support the termination of Mother's parental rights on each of these bases. The reasons Mother has given to reverse our decision are stated in a concise statement of matters complained of on appeal, which Mother filed in response

to our Rule 1925(b) order. They are narrow and limited and, we believe, without merit. They are each addressed below.

## DISCUSSION

"Parents are required to make diligent efforts towards the 'reasonably prompt assumption of full parental responsibilities.'" *In re E.A.P.,* 944 A.2d 79, 83 (Pa. Super. 2008). "Where the parent does not exercise reasonable firmness 'in declining to yield to obstacles,' his parental rights may be forfeited." *Id.* "Further, parental duty requires that the parent not yield to every problem, but must act affirmatively, with good faith interest and effort, to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances." *In re J.I.R.,* 808 A.2d 934, 938 (Pa. Super. 2002), *appeal denied,* 573 Pa. 672, 821 A.2d 587 (2003).

As of the date of the termination hearing, the child was out of his mother's care for over two years. Why this occurred is the real question that has to be answered. "The duty of the court under the Juvenile Act to provide rehabilitative services to the parent of a dependent child is recognized as a correlative responsibility, *with that of the parent,* to satisfy the mandate contained in the Adoption Act, prior to CYS proceeding to petition for involuntary termination of parental rights pursuant to section 2511(a)." *In the Interest of Lilley,* 719 A.2d 327, 331 (Pa. Super. 1998). (emphasis added) (footnote omitted) "Where the child is in foster care, this affirmative duty requires the parent to work towards the return of the child by cooperating with the agency to obtain the rehabilita-

tive services necessary for [her] to be capable of performing [her] parental duties and responsibilities." *In re G.P.-R.,* 851 A.2d 967, 977 (Pa. Super. 2004).

The real reason for the separation between Mother and the child is Mother's refusal to accept responsibility for the abuse of Jacob and her need for sexual offender's treatment. (N.T. 9/30/08, p. 51.) Mother argues, at times, that her role in the abuse of Jacob was purely passive; that she was aware of the abuse and did nothing to stop it, hence her limited plea to reckless endangerment of a child. (Concise statement, no. 1.) That stance, however, is not completely accurate. As the evidence developed at trial, not only was Mother aware of the abuse, she was present when Jacob's father molested him. Further, on at least two occasions that she disclosed to the polygraph examiner, she herself physically and sexually abused Jacob. The need for Mother to successfully complete sexual offender's treatment before the child can be safely returned to her is undeniable.

Every argument Mother makes as to why she did not promptly obtain a sexual offender's evaluation and follow through with its recommendation fails. (Concise statement, no. 2.) The question of transportation was addressed by Megan Lukasevich, who testified that she provided Mother with information on who to contact for transportation. (N.T. 9/19/08, pp. 9, 32-35.) Not once did Mother testify that she made an effort to contact any of these resources. (N.T. 9/30/08, pp. 12-13.) Further, Mother's sister and brother-in-law were possible resources and, in fact, provided transportation if she required it on other occasions. (N.T. 9/30/08, p. 29.)

The issue of costs is exaggerated. Mother resided with her own mother and, consequently, her living expenses were reduced. She receives monthly disability payments of $341 and has the ability to be employed part-time. (N.T. 9/30/08, pp. 29-30, 48.) Krista Welter of Forensic Treatment Services testified that they were willing to work with Mother regarding payments and funding, but she made no effort to cooperate. (N.T. 9/19/08, p. 67.)

Even now, Mother questions the need for the sexual offender's evaluation and refuses to accept responsibility for her failure to successfully complete the sexual offender's treatment which two separate agencies have recommended. Instead, she argues that the fault is attributable to CYS, in that CYS failed to provide her with the requisite information to obtain the requested services. (Concise statement, no. 4.) This claim ignores the testimony of Megan Lukasevich as to the availability of transportation as well as the referrals and arrangements CYS made to have Mother evaluated and then treated, as recommended. To the extent Mother argues that CYS was obligated to fund the costs of the evaluation and treatment, and its failure to do so was an obstacle to her receipt of these services, Mother cites no authority that CYS was obligated to do so. Cf. *In re N.W.,* 859 A.2d 501, 510 (Pa. Super. 2004) (noting that an agency's failure to provide either housing or employment does not excuse noncompliance with those goals in a family service plan); *In re Baby Boy H.,* 401 Pa. Super. 530, 534, 585 A.2d 1054, 1056-57 (1991) (finding that actual obstruction by a social agency will excuse failure to perform parental duties). Again, the real cause of noncompliance has been Mother's failure to come to terms with her

situation and make a serious effort to comply with the goals set by CYS.

Mother first contacted Forensic Treatment Services to make an appointment for an evaluation on December 31, 2007, because she was aware that a review hearing in the dependency proceedings was scheduled for January 4, 2008, and that a change in goal from reunification to termination and adoption was a possibility. (N.T. 9/19/08, p. 11; N.T. 9/30/08, p. 33.) Then, approximately one week prior to the September 19, 2008 termination hearing, she again contacted Forensic Treatment Services and indicated her willingness to reschedule and be readmitted for treatment. (N.T. 9/19/08, pp. 13, 78.) These attempts at delay and manipulation will not be condoned. As observed in *In re K.Z.S.,* 946 A.2d 753, 758 (Pa. Super. 2008),"A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous."

It is true that CYS did not permit visits between Mother and the child while she was in prison between February 2007 and August 2007. (Concise statement, no. 3.) This fact, however, does not explain or justify her failure to provide for the child or to perform parental duties for the 14-month period when she was not in prison: the eight-month period between June 15, 2006 and February 2007, and the six-month period between August 2007 and February 2008.

Nor are we convinced that Mother exercised reasonable firmness in maintaining, to the extent possible, a continuing close relationship with the child while she

was in prison. "[A] parent's incarceration does not preclude termination of parental rights if the incarcerated parent fails to utilize given resources *and* to take affirmative steps to support a parent-child relationship." *E.A.P.,* 944 A.2d at 83. (emphasis in original) The burden of producing evidence that those resources available to maintain a close parental relationship have been utilized is upon the parent in prison. See *e.g., Adoption of Baby Boy A. v. Catholic Social Services,* 512 Pa. 517, 521 n.5, 517 A.2d 1244, 1246 n.5 (1986); see also, *In re C.L.G.,* 956 A.2d 999, 1006-1007 (Pa. Super. 2008) (holding that where a mother's addiction to drugs placed her daughter in danger and also led to criminal conduct which resulted in imprisonment it was "the underlying drug issues which preclude[d] Mother from properly caring for [the child], and not the incarceration, which is merely a consequence of Mother's inability to lead a life free from involvement with drugs").

The real and still existing cause of her separation from the child has been the delayed evaluation, determination, and treatment of her status as an untreated sexual offender for more than three years. This status makes her a risk to the child and to all children. This status is one for which she bears the responsibility, yet refuses to accept it. This status is the one which has most directly and substantially prevented her from forming and maintaining a relationship with the child. Mother has clearly failed to remedy this status within a reasonable time. (N.T. 9/19/08, p. 16; N.T. 9/30/08, pp. 46-47.)

On January 22, 2008, the child's placement goal in the dependency proceedings was changed from reunification to termination and adoption. (N.T. 9/19/08, p. 6.) This

change in goal is significant. "By allowing CYS to change its goal to adoption, the trial court has decided that CYS has provided adequate services to the parent but that he/she is nonetheless incapable of caring for the child and that, therefore, adoption is now the favored disposition." *N.W.,* 859 A.2d at 509. Once the placement goal has been changed from reunification to adoption, "[t]he adequacy of CYS' efforts toward reunification is not a valid consideration [in termination proceedings], as the law allows CYS to 'give up on the parent' once the service plan goal has been changed to adoption." *In re A.L.D.,* 797 A.2d 326, 341 (Pa. Super. 2002).

"In *In re N.C.,* the court stated:

"Placement of and custody issues pertaining to dependent children are controlled by the Juvenile Act, which was amended in 1998 to conform to the federal Adoption and Safe Families Act (ASFA). . . . The policy underlying these statutes is to prevent children from languishing indefinitely in foster care, with its inherent lack of permanency, normalcy, and long-term parental commitment. . . . Consistent with this underlying policy, the 1998 amendments . . . place the focus of dependency proceedings, including change of goal proceedings, on the child. Safety, permanency, and well-being of the child must take precedence over *all* other considerations, including the rights of the parents." 909 A.2d 818, 823 (Pa. Super. 2006). (citations omitted) (emphasis in original) (footnotes omitted)

The ASFA is "designed to curb an inappropriate focus on protecting the rights of parents when there is a risk of subjecting children to long-term foster care or return-

ing them to abusive families." *In re C.B.,* 861 A.2d 287, 295 (Pa. Super. 2004), *appeal denied,* 582 Pa. 692, 871 A.2d 187 (2005).

The ASFA recognizes that the safety, permanency and well-being of the child are paramount in his best interests and to his future. 42 U.S.C. §671(a)(15)(A). The ASFA requires that when a child has been in foster care under the responsibility of the state for 15 of the most recent 22 months, the state is required to file a petition to terminate the parental rights of the child's parents. 42 U.S.C. §675(5)(E). At the time CYS filed the termination petition, the child was in placement for at least 15 of the most recent 22 months. In filing the petition, CYS was doing what the legislature expected and required it to do.

At this point, the child has been in foster care for more than two years. To allow this status to continue indefinitely, in the hope that Mother will eventually receive treatment which she believes is unnecessary and has repeatedly resisted even before the child was born, is not in the child's best interest. Instead, we believe that the child's need for permanency is best achieved by terminating Mother's parental rights and permitting the child to be adopted by his foster parents.

## CONCLUSION

In accordance with the foregoing, it is respectfully requested that Mother's appeal be denied and that the final decree of termination dated October 6, 2008, be affirmed.