J-A25041-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: G.D-L., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: J.L., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 640 WDA 2023 |

Appeal from the Order Entered May 9, 2023
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  CP-02-AP-0000118-2022

BEFORE:   BOWES, J., KUNSELMAN, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.:                   **FILED: February 20, 2024**

J.L. ("Father") appeals from the May 9, 2023 order involuntarily terminating his parental rights to his biological son, G.D-L. ("Child"), born in February 2017, pursuant to 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b).[1]  After careful review, we affirm.

We glean the following factual and procedural history of this matter from the certified record.  Allegheny County Office of Children, Youth and Families ("CYF") first became involved with this family in February 2019, when it received a truancy referral concerning M.R., Child's older half-brother through

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1]  In an order filed the same day, the orphans' court also involuntarily terminated the parental rights of R.D., Child's mother.  She did not file an appeal.

R.D. ("Mother").  *See* N.T., 5/5/23, at 48.  At that time, Mother and Father (collectively, "Parents") were unmarried and resided together at Father's home.  It is unclear whether in-home services were immediately provided to the family following this initial contact.  Parents' relationship was "very tumultuous," and involved significant intimate partner violence ("IPV").  *See id*. at 100.  Father was identified as both a victim and a perpetrator of this domestic violence with Parents having each sought protection from abuse ("PFA") orders against one another on different occasions.  *See id*.

On March 5, 2019, officers of the Pittsburgh Police Department executed a search warrant at the family's residence in Pittsburgh, Pennsylvania, which resulted in the seizure of cocaine, marijuana, opioids, drug paraphernalia, eleven firearms, ammunition, and $4,000 in cash.  *See id*. at 106-07; CYF Exhibit 8.  Child was present in the home at the time of the police raid.  *See* CYF Exhibit 8.  Father was arrested and admitted to being involved in the distribution of cocaine.  *Id*.  In connection with these events, Father was charged with a number of narcotics-related crimes under both federal and Pennsylvania state law.  *See* N.T., 5/5/23, at 72; Stipulations as to Father, 5/3/23, at ¶ 14.  Parents were briefly imprisoned following their arrest, during which time Child resided with another family member.

CYF did not learn of these events, however, until the summer of 2019, at which time they filed a dependency petition.  *Id*.  On October 29, 2019, Child was adjudicated dependent and CYF was awarded legal custody.  *See*

*id*. at 49-50. Father initially retained physical custody of Child. *Id*. In connection with the dependency findings, the court ordered Father to, *inter alia*, undergo a substance abuse evaluation through Pennsylvania Organization for Women in Early Recovery ("POWER"), follow treatment recommendations, provide random drug screenings, address his pending criminal charges, and complete an IPV assessment. *See id*. at 51. During the course of these proceedings, Father also disclosed having a severe anxiety disorder and was diagnosed with an antisocial personality disorder. *See id*. at 103, 129-30. Consequently, the court also directed Father to address his mental health. *See id*. at 103.

On February 4, 2020, CYF sought and was awarded emergency physical custody of Child after Father tested positive for cocaine at one of his random drug screens. *See* Joint Exhibit 4. Child was committed to foster care. Father was permitted regular supervised visitations with Child. In permanency review orders issued between June 2020 and April 2021, Father was found to be in minimal compliance with his court-ordered goals.

On February 19, 2021, Father was arrested and charged with Pennsylvania state law misdemeanors and felonies relating to the possession and sale of controlled substances. Father was briefly incarcerated in connection with these charges and, thereafter, began to serve an indeterminate period of house arrest. *See* N.T., 5/5/23, at 101-02; Continuance Order, 3/18/21, at 1 (indicating that Father was incarcerated as

of March 2021). We discern that these new charges resulted in a determination of guilt that led to the imposition of a period of probation. *See*, *e.g.*, N.T., 5/5/23, at 68, 101-02, 150.

We note that following his removal, Child was diagnosed with, *inter alia*, post-traumatic stress disorder ("PTSD"), attention deficit hyperactivity disorder ("ADHD"), and autism spectrum disorder. *See id*. at 100, 108. Upon his removal from Father's care at approximately three years old, Child displayed "limited self-control" and lacked "emotional regulation." *See id*. at 109. He was adjudged to be developmentally delayed and largely non-verbal. *See id*. at 80, 109. Following his foster placement, Child also began to display physically aggressive behavior towards both people and animals in his foster homes. *See id*. at 109. As a result, Child's initial foster placements between February 2020 and July 2021 were unsuccessful. *See id*. at 79-80.

On July 24, 2021, Child was placed with N.C. ("Foster Mother"), who works as an occupational therapist and has been largely successful at helping Child to curb his aggressive behavior. *See id*. at 79-82. Child has remained in her care since that time and she is a preadoptive resource. *See id*. at 152.

Between June 2021 and January 2023, Father's attentiveness to his permanency objectives improved and his compliance was rated as moderate. Specifically, Father completed his POWER assessment, a recommended course of substance abuse treatment, and a parenting class. *See id*. at 49, 69, 101. Father also completed a course of anger management treatment that was

credited as positive progress by CYF. *See id*. at 69. Father's outstanding state and federal charges following his arrest in March 2019 remained unresolved, which was a source of significant concern as reflected in the court's permanency review orders. Furthermore, Father's participation in random drug screenings was inconsistent throughout these proceedings.

On September 9, 2022, CYF filed a petition to involuntarily terminate Father's parental rights to Child pursuant to 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b).[2] Contemporaneously, Father pled guilty to the federal offense of conspiracy to distribute cocaine and was sentenced to a term of incarceration of one year and one day, which he began to serve on February 16, 2023. *See id*. at 72. Father was also sentenced to two years of supervision following his release. *See id*. at 130-31. Father's remaining charges related to his March

_____

[2] On September 27, 2022, the orphans' court appointed KidsVoice to advocate on behalf of Child's legal interests as required by 23 Pa.C.S. § 2313(a). At the termination hearing, Jonathan Budd, Esquire, of KidsVoice appeared and represented Child during the proceedings. We note that KidsVoice also served as Child's guardian *ad litem* in these proceedings. However, the orphans' court determined that "no conflict exists" with respect to this dual representation. *See* Order, 9/27/22, at 1. Thus, we conclude that no structural error exists. *See Interest of K.N.L.*, 284 A.3d 121, 151 n.23 (Pa. 2022) (appellate court must perform limited *sua sponte* review of termination of parental rights decisions for orphans' court's appointment of legal counsel and express ruling regarding conflict between best and legal interests) (citing *In re Adoption of K.M.G.*, 240 A.3d 1218, 1236 (Pa. 2020)).

2019 arrest were scheduled for a plea hearing in Pennsylvania state court on May 8, 2023.[3]  ***See*** Stipulations as to Father, 5/3/23, at ¶ 14.

On May 5, 2023, the orphans' court held a termination hearing, at which time Child was six years old.  Therein, CYF adduced testimony from, *inter alia*, foster care coordinator Sydney Webb, CYF caseworker Rhianna Diana, and Dr. Patricia Pepe, a licensed psychologist who conducted an individual examination of Father and bonding assessments concerning Child's respective interactions with Father and Foster Mother.  Father appeared and testified virtually.  He was also represented by counsel who was present in the courtroom for the termination hearing.

On May 9, 2023, the orphans' court filed an order that involuntarily terminated Father's parental rights pursuant to Section 2511(a)(2), (5), (8), and (b).  On May 31, 2023, Father filed a timely notice of appeal along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).  On June 29, 2023, the orphans' court filed a responsive opinion pursuant to Rule 1925(a)(2)(ii).

Father has raised the following issues for our consideration:

> 1.     Did the [orphans'] court abuse its discretion and/or err as a matter of law in granting the petition to involuntarily terminate Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (5), and (8)?

---

[3]   The ultimate resolution of Father's remaining criminal charges under Pennsylvania state law are not clear from the certified record.

2.      Did the [orphans'] court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Father's parental rights would best serve the needs and welfare of the [Child] pursuant to 23 Pa.C.S. § 2511(b)?

Appellant's Brief at 7.

Our standard of review in this context is well-settled:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence.  When applying this standard, the appellate court must accept the orphans' court's findings of fact and credibility determinations if they are supported by the record.  Where the orphans' court's factual findings are supported by the evidence, an appellate court may not disturb the orphans' court's ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result.  Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.  This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, the orphans' court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support.  Termination of parental rights has significant and permanent consequences for both the parent and child.  As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Interest of M.E.*, 283 A.3d 820, 829-30 (Pa. Super. 2022) (cleaned up).

The involuntary termination of parental rights is governed by Section 2511 of the Adoption Act, which calls for a bifurcated analysis that first focuses upon the "eleven enumerated grounds" of parental conduct that may warrant termination. *Id*. at 830; *see also* 23 Pa.C.S. § 2511(a)(1)-(11). If the orphans' court determines the petitioner has established grounds for termination under at least one of these subsections by "clear and convincing evidence," the court then assesses the petition pursuant to Section 2511(b), which focuses upon the child's developmental, physical, and emotional needs and welfare. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). This Court need only agree with the orphans' court's determination as to "any one subsection of [Section] 2511(a), in addition to [Section] 2511(b), in order to affirm the termination of parental rights." *T.S.M.*, 71 A.3d at 267.

Consistent with this case law, our analysis in the instant case will focus upon Section 2511(a)(2) and (b), which provides as follows:

> **(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . . .

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. . .

23 Pa.C.S. § 2511(a)(2), (b).

In order to satisfy Section 2511(a)(2), the petitioning party must establish: "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021). Grounds for termination pursuant to Section 2511(a)(2), however, "are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied." *Id*. (citing *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010)). On this point, we emphasize that "[p]arents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." *Id*.

If a petitioner establishes adequate grounds for termination pursuant to Section 2511(a), we then turn to Section 2511(b), which requires that the court "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). Of note, we "should consider the matter from the child's perspective, placing [their] developmental, physical, and emotional needs and welfare above concerns for

the parent." *In the Interest of K.T.*, 296 A.3d 1085, 1105 (Pa. 2023). Moreover, this determination "should not be applied mechanically," but "must be made on a case-by-case basis," wherein "the court must determine each child's specific needs." *Id*. at 1106. Thus, there is no "exhaustive list" of factors that must be considered. *Id*. at 1113 n.28. While the particular facts of each case determine the factors to be considered, our precedent indicates that relevant points of inquiry include "intangibles such as love, comfort, security, and stability." *T.S.M.*, 71 A.3d at 267.

Our Supreme Court has mandated, however, that an evaluation pursuant to Section 2511(b) should consider the child's bond with his or her parent. *See In re E.M.*, 620 A.2d 481 (Pa. 1993). Specifically, we must render "a determination of whether the bond is necessary and beneficial to the child[.]" *K.T.*, 296 A.3d at 1113. This evaluation involves consideration of the effect of severing the child's bond with their parent. *Id*. at 1109. In termination matters, "severance of a necessary and beneficial relationship is the kind of loss that would predictably cause 'extreme emotional consequences' or significant, irreparable harm." *Id*. at 1109-10 (quoting *E.M.*, 620 A.2d at 484). Our Supreme Court has distinguished, however, "extreme emotional consequences" from a mere "adverse impact" in the termination context. *Id*. at 1111. Specifically, the High Court has cautioned that Pennsylvania courts must not truncate their analysis and preclude

severance "based solely on evidence of an 'adverse' or 'detrimental' impact to the child." *Id*. at 1114.

Furthermore, "courts must not only consider the child's bond with the biological parent, but also examine the . . . love, comfort, security, and stability the child might have with the **foster** parent." *K.T.*, 296 A.3d at 1111 (emphasis in original; cleaned up). Thus, we consider factors that arise from the facts of each case, such as: (1) the child's need for permanency and length of time in foster care; (2) whether the child is bonded with foster parents; and (3) whether the foster home meets the child's needs. *Id*. at 1113.

Overall, "bond, plus permanency, stability and all 'intangible' factors may contribute equally to the determination of a child's specific developmental, physical, and emotional needs and welfare, and thus are all of 'primary' importance in the Section 2511(b) analysis." *Id*. at 1109.

With these overarching legal principles in mind, we now turn to Father's first claim relief, which concerns Section 2511(a)(2). Specifically, Father asserts that "[i]nsufficient evidence was presented to support a determination that there was a continued incapacity of Father to provide essential parental care for [Child]." Father's Brief at 21. He maintains that "[t]he evidence clearly shows that Father was able to provide essential parental care to [Child] at the beginning of the case." *Id*. at 22. Father also notes that he was able to complete many of the recommended services assigned to him. *See id*.

("The evidence clearly shows that Father worked with all required services and successfully completed many of said services.").

While acknowledging Father's progress on some fronts, the orphans' court found that he had not made sufficient progress on the most pressing of his parental incapacities. **See** Orphans' Court Opinion, 6/29/23, at 11 ("While Father has been successful with some of his goals, he has not made any meaningful progress on the most important ones."). We agree.

The certified record reflects that Father was able to make some progress with respect to his permanency goals. He completed his POWER assessment, a course of substance abuse counseling, anger management treatment, and an in-home parenting class. **See** N.T., 5/5/23, at 49, 69, 101. Father also has not tested positive for having used illicit substances since February 2020. **See** CYF Exhibit 3. However, Father's arguments greatly overstate the level of his compliance and efforts. Of note, Ms. Diana, the CYF caseworker, reported that Father has never completed IPV counseling. **See** N.T., 5/5/23, at 103. Furthermore, she reported concern for Father's inconsistent participation in drug screens, which raised significant questions regarding his ongoing sobriety. **See id**. (indicating that Father attended only sixteen of forty-seven screens conducted between March 2021 and February 2023). Finally, Ms. Diana also testified that Father has never provided documentation attesting to his regular enrollment in mental health treatment for his anxiety disorder. **See id**. at 71-72, 103-04.

Moreover, Father's arguments fail to adequately address the most pressing incapacities impacting his ability to provide essential parental care and control: his felonious behavior, present incarceration, and prospects for additional criminal punishment. **See** Father's Brief at 19-23 (acknowledging in passing that Father was incarcerated in February 2023 without offering any further discussion). Our Supreme Court has explained that while a parent's incarceration is not automatically dispositive, it is a relevant and potentially determinative factor to consider pursuant to Section 2511(a)(2):

> [I]ncarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing 'essential parental care, control or subsistence' and the length of the remaining confinement can be considered as highly relevant to whether 'the conditions and causes of the incapacity, abuse, neglect, or refusal cannot or will not be remedied by the parent,' sufficient to provide grounds for termination pursuant to [Section] 2511(a)(2)

***In re Adoption of S.P.***, 47 A.3d 817, 830 (Pa. 2012).

With respect to the first necessary element of Section 2511(a)(2), it is beyond cavil that Father suffers from repeated and continued parental incapacities that are well-documented in the certified record, *i.e.*, his unaddressed IPV and mental health concerns, substance abuse problems, involvement in the sale of illicit narcotics, and ongoing imprisonment.

It is also clear that these many incapacities have caused Child to be without essential parental care, control, and subsistence. Due to his unresolved anxiety problems, Ms. Diana testified that Father was unable to regularly participate in supervised visits with Child. **See** N.T., 5/5/23, at 71

- 13 -

("[H]e was not always consistent due to stating that he has panic attacks and anxiety about driving far distances."). Dr. Pepe also reported that Father's mental health negatively impacted Child during visits, wherein Father's anxious behavior produced angry responses from Child. *See id*. at 128-29.

Father's ongoing incarceration constitutes the most significant and intractable barrier to his ability to provide essential parental care, control, and subsistence to Child. Specifically, Father is scheduled to be incarcerated at least through February 2024. While he remains incarcerated, Ms. Diana testified that Father's incarceration severely limits his ability to participate in Child's contemporaneous treatment for ADHD, PTSD, and autism. *See id*. at 99-100 (indicating that Father is limited to essentially participating in a weekly phone call with Foster Mother to obtain updates). Father is also unable to visit with Child in person and their interactions are restricted to a weekly phone call. *See id*. at 104. Additionally, Father's imprisonment means that he is simply and undeniably unable to provide any day-to-day care for Child.

Based on the foregoing, it is quite clear that Father's incapacities have caused Child to be without essential parental care, control, and subsistence due to the combination of Father's unaddressed IPV issues, mental health disorders, history of substance abuse, and criminal behavior.

With respect to the third and final element of Section 2511(a)(2), the certified record bespeaks that Father cannot or will not remedy these incapacities. Despite more than three years of services from CYF, Father has

failed to adequately address his IPV, mental health, and substance abuse troubles. At the time of the termination hearing in May 2023, he was slated to remain imprisoned until at least February 2024.[4] **See id**. at 72. Even assuming, *arguendo*, that Father was released as scheduled, his unresolved charges under Pennsylvania state law creates significant uncertainty regarding his ability to begin providing essential care to Child in a timely fashion. Moreover, the fact that Father was arrested for trafficking of narcotics multiple times during the course of this case indicates that his potential for recidivism remains high.

Based upon the foregoing analysis, we find no abuse of discretion or error of law in the orphans' court's conclusion that involuntary termination of Father's parental rights was warranted pursuant to Section 2511(a)(2).

---

[4] In his brief, Father asserts that his release date in connection with his federal charges was moved up to November 2023. **See** Father's Brief at 25 ("Father . . . is set for release in November 2023 per the Northeast Ohio Correctional Center website."). No such information appears in the certified record.

We remind Father that "[f]or the purposes of appellate review, what is not of record does not exist." **Frank v. Frank**, 587 A.2d 340, 342 n.5 (Pa. Super. 1991) (citing Pa.R.A.P. 1921). We may only rely upon facts that appear in the certified record. **See In re J.I.R.**, 808 A.2d 934, 935 (Pa. Super. 2002). We may not consider "unsubstantiated allegations" in reviewing an appeal. **K-B Bldg. Co. v. Sheesley Const., Inc.**, 833 A.2d 1132, 1139 (Pa. Super. 2003). To the extent Father has attempted to adduce new evidence in his brief, we are not permitted to consider such materials. **See Warfield v. Warfield**, 815 A.2d 1073, 1076 n.4 (Pa. Super. 2003) ("[T]he unsubstantiated assertions contained in the parties' briefs do not constitute record evidence.").

Having found sufficient grounds for termination pursuant to at least one subsection of Section 2511(a), we now turn to Father's second claim for relief concerning the orphans' court's findings pursuant to Section 2511(b). In relevant part, Father asserts that he shares a strong, parental bond with Child that should be preserved. *See* Father's Brief at 23-26. We must disagree.

The orphans' court concluded that while Child has "familiarity" with Father, Child "does not look to him as a psychological parent and does not rely on him to meet his daily needs outside of visitation." Orphans' Court Opinion, 6/29/23, at 12. By contrast, the court found that Child has "made great strides" since he entered the care of Foster Mother: "[Foster Mother] has been able to provide the stability, support, and structure that [C]hild desperately needed. She has been a tireless advocate for him and has ensured that he received vital services[.]" *Id*. Therefore, the orphans' court found that Child would not suffer "any irreparable emotional harm if Father's parental rights were terminated." *Id*. at 11. Our review reveals ample support for the orphans' court's conclusions on this point.

Specifically, the orphans' court largely credited the testimony of Dr. Pepe, who conducted both an individual evaluation of Father as well as bonding assessments concerning Child's respective interactions with Father

and Foster Mother.[5]  **See** N.T., 5/5/23, at 118.  Based upon her representations during these evaluations, Dr. Pepe diagnosed Father with an antisocial personality disorder.  **See id**. at 129-30.  She testified that Father's involvement in the sale of narcotics was generally indicative of his "poor judgment."  **Id**. at 130.  Dr. Pepe also opined that Father's ongoing incarceration coupled with his mental disorder was depriving Child of "stability" and a "lack of permanency."  **Id**. at 131.

Through her observations, Dr. Pepe also concluded that a positive bond existed between Father and Child.  **See id**. at 148 ("[Child] seemed to be familiar with [Father].  He was very happy to see him.  I would say that there is some attachment[.]").  However, she also determined that Child's "primary" parental attachment was not with Father, but with Foster Mother.  **Id**. at 134.  Indeed, Dr. Pepe testified that Child had expressed his desire to continue living with Foster Mother to the extent that his young age permitted.  **See id**.  Overall, she averred that terminating Father's parental rights would not detrimentally impact Child.  **See id**. at 152-53.

---

[5]  In his brief, Father baldly suggests that no bonding assessment occurred concerning his interactions with Child due to his imprisonment.  **See** Father's Brief at 25 ("Father's bond was not assessed due to his incarceration.").  Father's assertion is belied by the certified record.  Dr. Pepe testified that she conducted an interactional assessment of Father and Child between September 2022 and October 2022.  **See** N.T., 5/5/23, at 118.  As discussed above, Dr. Pepe also opined at length concerning her conclusions regarding the nature of Father's bond with Child.  **See id**. at 117-52.

By contrast, however, Dr. Pepe opined that severing Child's bond with Foster Mother would be "disastrous" for Child's well-being. ***See id***. at 135. She aptly summarized this conclusion: "[Child] had exhibited significant problems prior to his current placement. He is now stabilized, healthy, happy, securely attached and to alter that would be very – I believe it would be very detrimental and would not be addressing his best interest." ***Id***. at 136.

Based upon the foregoing, we find no abuse of discretion or error of law in the orphans' court's findings pursuant to Section 2511(b).

Thus, we affirm the orphans' court's order involuntarily terminating Father's parental rights to Child pursuant to 2511(a)(2) and (b).

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

2/20/2024