J-S15029-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: I.G.N., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: I.G.N., MINOR | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2943 EDA 2025 |

Appeal from the Order Entered October 10, 2025
In the Court of Common Pleas of Delaware County Orphans' Court at
No(s):  0052-2024-A


BEFORE:   OLSON, J., MURRAY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY MURRAY, J.:                    **FILED JUNE 9, 2026**

I.G.N., a daughter born in March 2010 (Child), appeals the orphans'

court's decree denying the petition, filed on her behalf by Alice Buggy Miller,

Esquire, Child's guardian *ad litem* and legal counsel (GAL),[1] to involuntarily

terminate the parental rights of Child's mother, K.N. (Mother),[2] pursuant to

---

[*] Former Justice specially assigned to the Superior Court.

[1] **See** 23 Pa.C.S.A. § 2512(a)(4) (providing that "[a]n attorney representing a child or a guardian *ad litem* representing a child who has been adjudicated dependent under 42 Pa.C.S.[A.] § 6341(c) (relating to adjudication)" may petition for termination of a parent's rights on the child's behalf).

[2] In his psychiatric evaluation of Mother (conducted in the course of these proceedings), licensed psychiatrist Steven Mechanick, M.D. (Dr. Mechanick), indicated Mother reported to him that Child, Child's fraternal twin sister (S.N.), and their elder sister (S.A.N.) (collectively, Children) were conceived via *in vitro* fertilization (IVF), using donor sperm and eggs.  GAL Exhibit 7(b) (Psychiatric Evaluation).

23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b).  After careful consideration, we affirm.

In its October 10, 2025, decree denying Child's petition to terminate Mother's parental rights (TPR petition), the orphans' court made the following findings of fact:

> 1.  This matter comes before the court by way of [Child's TPR petition,] filed … on June 25, 2024….
>
> 2.  Delaware County Children and Youth Services [(CYS)] joined the petition.[3]
>
> 3.  Th[e orphans' c]ourt held hearings on [the TPR petition on] October 29, 2024, December 19, 2024, [] April 7, 2025, [and May 15, 2025] ….[4]
>
> ….
>
> 5.  Mother has resided … in Wallingford, Pennsylvania, since 1987.  Mother presently lives with her daughter, S.N. ([born in March ]2010), the fraternal twin sister of Child.  Prior to the incidents leading up [to Child's placement], Mother lived with [Children].  N.T., 4/7/25, at 171-72.

---

[3] CYS did not appeal the orphans' court's decree denying termination of Mother's parental rights.

[4] Numerous privately-retained attorneys entered their appearances on behalf of Mother throughout the course of Child's dependency and termination cases. Gregory Gilston, Esquire (Attorney Gilston), represented Mother through the second day of the TPR hearing, December 29, 2024, despite having filed a motion to withdraw his appearance on November 26, 2024.  The record does not contain an order permitting Attorney Gilston's (or any of Mother's prior counsels') withdrawal; however, on January 29, 2025, the orphans' court appointed Keith DiFabio, Esquire (Attorney DiFabio), to represent Mother. Attorney DiFabio represented Mother through the remainder of the TPR hearing and represents Mother in the instant appeal.

6. Mother voluntarily relinquished her parental rights … to … S.A.N. on January 24, 2025.[5]

7. The [parental] rights of [M.N.], father of Child and S.A.N. [(Father)], were involuntarily terminated by [] decree on January 24, 2025.

8. The parental rights of John Doe, or any other person claiming paternity [of] Child and S.A.N. were involuntarily terminated pursuant to [] decree on April 7, 2025.

9. Since August 2023, Mother has been employed at Edgemont Scholars Academy in Chester [County, Pennsylvania,] through AmeriCorps. Prior to this job, Mother was employed as a paralegal at two different law firms. Mother is financially able to support herself and … S.N. *Id.* at 172.

Decree, 10/10/25, at 1-2 (unpaginated) (footnotes added; punctuation, capitalization, and some citations modified).

The orphans' court next explained how Children came to be placed into foster care:

_____

[5] Child and S.A.N. currently reside with the same foster parents (foster parents), who are pre-adoptive resources. Although not contained within the certified record, GAL filed a separate TPR petition on behalf of S.A.N., and the orphans' court received evidence concerning both Child's and S.A.N.'s TPR petitions at the same hearing.

At the conclusion of the first day of the TPR hearing, Child presented to the orphans' court a letter she prepared for the court's consideration. N.T., 10/29/24, at 280-82. Neither the letter nor its contents are contained within the certified record. However, prior to the second day of the TPR hearing, Attorney Gilston represented that Mother "is prepared to voluntarily terminate her parental rights [to S.A.N.]," after having reviewed Child's letter. N.T., 12/19/24, at 5; *see also id.* (Attorney Gilston vaguely representing that Child's letter "changed some things for [Mother,]" and stating, "[Child's] letter contains some serious accusations, packs a serious punch to [Mother.]").

- 3 -

10. CYS received a referral on September 22, 2021, from the Wallingford[-]Swarthmore School District. The referral was regarding S.N., who had missed six out of nine days of school. N.T., 4/7/25, at 24. S.N.'s school contacted Mother, who stated that [Mother] was sick and dying, and that [C]hildren were dying, and that the family was saying their goodbyes. *Id.*

11. The school contacted the Nether Providence Police Department, which did a wellness check on September 24, 2021. When the police arrived at the home, they found [C]hildren alone. [C]hildren informed the police that they had not seen Mother for 24 hours. *Id.*

12. A shelter care hearing took place shortly thereafter and, there being no viable [kinship] resources available, [C]hildren were placed in foster care. *Id.* at 29.

13. Mother [admitted] herself into Haven Behavioral Health [(Haven)] on September 23, 2021. [Mother] was treated and released on October 5, 2021. Child's Exhibit 6c.

14. CYS set up a schedule with Elwyn [Clinical Visitation (Elwyn)] for Mother to have [supervised] visitation with [C]hildren. Visitations were scheduled for once per week, beginning in October 2021. Due to an ongoing CYS investigation, visitation did not actually take place until December 2021. N.T., 4/7/25, at 31; Child's Exhibit 9.

*Id.* at 2-3 (some citations modified).

The orphans' court detailed the ensuing procedural history, and the child welfare issues Mother was tasked with addressing:

15. An adjudication hearing was held on December 14, 2021. Mother was present via telephone at this hearing. The child welfare issues identified were lack of proper care and control, truancy, and ongoing mental health issues for Mother. CYS Exhibit 2. Mother was ordered to: (1) participate in a mental health evaluation arranged by CYS; (2) visit [Children] regularly as arranged by CYS; (3) permit CYS access to her home upon request; (4) participate in a Parent Education Program, as arranged by CYS; and (5) obtain/maintain stable housing. *Id.*

16. CYS arranged, and Mother participated in, a psychiatric evaluation with Dr. Mechanick, which took place on November 9, 2021. N.T., 4/7/25, at 31.

17. CYS also referred Mother to Parents and Children Together ("PACT"), a parent education class, in November 2021, which she completed. *Id.* at 45.

….

21. In April of 2023, S.N. started family therapy with Mother. Mother had consistently communicated with CYS about the need and her desire for family therapy from the early stages of the case. *Id.* at 180. S.N. participated in family therapy. [] Child declined to participate in family therapy. *Id.* at 102-03.

*Id.* at 3-4 (some citations modified).

The orphans' court conducted permanency review hearings in March, June, and December 2022; June and September 2023; February and July 2024; and August 2025. The orphans' court consistently found Mother to be moderately-to-fully compliant with the family's permanency plan. The orphans' court also consistently found Mother to have made moderate-to-substantial progress towards alleviating the circumstances necessitating Child's placement.

On June 25, 2024, GAL filed, on Child's behalf, a TPR petition, pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b). Mother filed an Answer to Child's petition. Additionally, on July 11, 2024, Mother filed a motion for special relief requesting that the orphans' court direct CYS to reunify Child

with Mother. Motion for Special Relief, 7/11/24, ¶ 6 (Mother alleging CYS has "taken minimal steps to reunify [C]hild with Mother.").[6]

The matter proceeded to a TPR hearing on the dates set forth above. Child was present for most of the hearing, and was represented by GAL throughout.[7] Mother appeared represented by counsel. Child presented the testimony of several witnesses, including Dr. Mechanick; licensed psychologist Karen Dybner-Madero, Psy.D. (Dr. Dybner-Madero); S.A.N.; Child; and CYS casework supervisor Charla Graham (Ms. Graham). Mother called S.N. as a witness and testified on her own behalf.[8]

_____

[6] Prior to the first day of the TPR hearing, on October 29, 2024, the orphans' court and the parties had an off-the-record discussion regarding Mother's motion for special relief. **See** N.T., 10/29/24, at 5 (the orphans' court indicating that Mother's motion for special relief "was … dependent on procedural issues that need to be … briefed by [c]ounsel."). Mother withdrew her motion on November 26, 2024. Praecipe to Withdraw Petition for Special Relief, 11/26/24.

[7] The orphans' court accepted GAL's representation that there exists no conflict between Child's best interests and legal interests. N.T., 10/29/24, at 6; **see also Interest of H.H.N.**, 296 A.3d 1258, 1264 (Pa. Super. 2023) ("[W]here there is no conflict between a child's legal and best interests, an attorney-guardian *ad litem* representing the child's best interests can also represent the child's legal interests.").

[8] The orphans' court additionally admitted, as a court exhibit, the report of court-appointed special advocate (CASA) supervisor Bron DiSalvia (marked Exhibit CASA-1). N.T., 4/7/25, at 169. As noted by the orphans' court, "CASA was assigned to the [] family on December 7, 2022. CASA recommended that Mother's parental rights be terminated so that [] Child could be adopted[ by foster parents]." Decree, 10/10/25, ¶ 63 (citing Exhibit CASA-1).

Dr. Mechanick testified that he conducted a psychiatric evaluation of Mother in November 2021. N.T., 10/29/24, at 19; ***see also id.*** at 33 (Dr. Mechanick confirming that he evaluated Mother approximately six weeks after Mother's discharge from Haven). In preparing for Mother's evaluation, Dr. Mechanick explained that he had reviewed Child's medical records, which revealed that Mother harbored unfounded suspicions (beginning in late 2018) that Child had multiple sclerosis. ***Id.*** at 21; ***see also id.*** at 22 (Dr. Mechanick detailing Child's neurological testing, the results of which concluded that Child's "symptoms were psychiatric in nature"). According to Dr. Mechanick, medical records further revealed that Mother, while exhibiting psychotic symptoms, took Child to Children's Hospital of Philadelphia because Mother was afraid Child had amyotrohic lateral sclerosis (ALS). ***Id.*** at 26. Dr. Mechanick testified that Mother subsequently submitted to psychiatric treatment, and received a mental health diagnosis of major depressive disorder with psychotic features. ***Id.*** at 27.

Dr. Mechanick detailed the circumstances leading to his evaluation of Mother:

> [I]n summary, … I noted that [Mother] reported that she had had a few difficult years leading up to September[] 2021, [and] that … [S.A.N. and S.N.] were losing their cognitive capacity and having trouble finding words. [Mother] was concerned that she[,] herself[,] might have ALS[,] because of physical symptoms of facial twitching and balance problems. [Mother] went to a lot of emergency rooms. [Mother] described receiving a [blood] transfusion because she was so anemic. … [Child] missed a lot of school, and [Child's] school contacted CYS. [Mother] explained to CYS that [Child] was having problems with tic[]s and

hallucinations. CYS demanded that [Child] have an evaluation. [Mother] took [Child] to a crisis center[, which] said there was no emergency. [Mother] described [] herself developing [] depression in 2021[,] with thoughts of ending her life, but no plan[ to do so]. [Mother] said she dropped [Children] off on September 22nd, 2021, and went to Media[, Pennsylvania,] and got a [m]otel room[, where she f]ell asleep. [Mother s]aid [Children] missed school the next day. [One of Children's] teachers texted [Mother], and the police did a wellness check. [Mother] said that she thought she was going to be arrested, and so she kept the phone off for over several hours. [Mother] eventually returned to her house and said she [was informed that] she could either hospitalize herself voluntarily or be committed.

*Id.* at 28-29; *see also id.* at 30 (Dr. Mechanick testifying that Mother reported to him that she conceived Children through IVF, and that Father "stopped being involved with [Children] after five or six years").

Following Mother's evaluation, Dr. Mechanick concluded that Mother "had a depressive disorder that led to her having difficulty taking care of [C]hildren in her home[.]" *Id.* at 31; *see also id.* at 39-40 (Dr. Mechanick clarifying that he diagnosed Mother with "major depression, single episode, in partial remission"). Dr. Mechanick noted that Mother previously (but no longer) believed that she suffered from ALS. *Id.*; *see also id.* at 32 (Dr. Mechanick opining that, "as [Mother] had apparently been sharing her unrealistic [health] concerns about her and [C]hildren's health with [C]hildren, this could be emotionally damaging to [C]hildren."); *id.* at 243 (S.A.N. describing an incident, when she was 13 years old, where Mother exposed herself to S.A.N. to show her a suspected medical issue; and S.A.N. testifying,

"I fear that if I were to go back[ to live with Mother], I would []resume that role of physician to [Mother].").

Dr. Mechanick opined that Mother "showed strikingly poor judgment by leaving [C]hildren alone at home and going to a motel, which was very odd behavior, and I didn't believe she really explained it well to me." *Id.* According to Dr. Mechanick, Mother minimized the nature and extent of her mental health symptoms, relating to him that she "just got a little worried about things. [Mother] didn't really acknowledge that she had had psychotic symptoms[, or] the degree to which she had unrealistic concerns about [C]hildren's health." *Id.* at 32. Dr. Mechanick testified that he was "concerned … that [Mother] might not be choosing to disclose current symptoms[,] such as paranoia or delusions[,]" but acknowledged "[t]here's no way we can know that without [] somebody disclosing [those symptoms] or from somebody else reporting that [Mother] mentioned [those symptoms]." *Id.* at 33.

On cross-examination, Dr. Mechanick agreed that, at the time of her evaluation, Mother's psychiatric symptoms were not as severe as on the date precipitating CYS's involvement. *Id.* at 40. Dr. Mechanick further testified that his only interaction with Mother was at the November 2021 psychiatric evaluation, and that CYS had not asked that he conduct a further assessment of Mother. *Id.* at 41, 48.

Dr. Mechanick next testified concerning his January 15, 2024, psychiatric evaluation of Child. *Id.* at 54.[9] Dr. Mechanick testified that Child reported previously having had a "pretty close" relationship with Mother, "but [Child] described [S.N. and S.A.N.] not getting much of [M]other's time because of this." *Id.* at 63; *see also id.* at 278 (Child testifying that Mother "had told me one day [], yes, you are the favorite."). Child told Dr. Mechanick that "[s]he hadn't seen [Mother] in the past two years by [Child's] own choice[,] and that she didn't feel comfortable or right about the idea of being around [Mother]." *Id.*

Dr. Mechanick testified that Child "developed a positive, supportive[,] and trusting relationship with [] foster parents." *Id.* at 64. Dr. Mechanick opined that returning Child to Mother's care "would likely be emotionally traumatic …, and that doing so would cause an exacerbation of [Child's] currently well[-]controlled anxiety disorder." *Id.* at 65. Dr. Mechanick concluded,

> I think for [Child], being adopted by [] foster parents[,] with whom she feels bonded and trusting and safe …, would only further [Child's] sense of safety and trust, that sense of permanency, and that needs to be accompanied by termination of [Mother's] parental rights.

*Id.* at 65-66.

---

[9] On that same date, Dr. Mechanick conducted a psychiatric evaluation of S.A.N., who reported that she desired to be adopted by foster parents. As noted above, Mother voluntarily relinquished her parental rights to S.A.N. on January 24, 2025.

On cross-examination, Dr. Mechanick responded as follows to Attorney Gilston's query concerning whether Mother's compliance with the family's permanency plan changed his clinical opinion regarding termination of Mother's parental rights to Child:

No, because I think the issue is, … even if [Mother] … has come to terms with [the past trauma she caused Child], even if [Mother] can be frank with [Child] about it, [Child is] still traumatized by what [she] went through. And I think for [Child,] emotionally[,] it would be like walking out onto thin ice. Whether [the ice was thin] or not, I think [Child] would be worried about constantly cracking [the ice] and going through[. Child] do[es] not feel a sense of safety and [Child has] not bonded with, or put another way, lost … whatever bond [she] had with [M]other. So, even if [Mother is] doing well now, I think it's too late.

*Id.* at 71-72; *see also id.* at 78 (Dr. Mechanick testifying that the fact that S.N. currently resides with Mother "doesn't really give me any information. I think that of the three children, [S.N.] had a different emotional reaction to all these circumstances[,] and chose to live with [M]other."); *id.* 79 (Dr. Mechanick acknowledging the importance of a sibling bond, but opining, "I think putting [Child and S.A.N.,] who would be unhappy and potentially decompensate[,] back in [M]other's home[,] wouldn't help any of the children[,] including [S.N.]").

Dr. Dybner-Madero testified that she conducted a bonding evaluation with foster parents, S.A.N., and Child, on November 16, 2023, "to see the dynamics and assess the strength of" S.A.N.'s and Child's bond with foster parents. *Id.* at 126. Based on her observations, Dr. Dybner-Madero described Child's relationship with foster parents as "very loving, easygoing,

[and] happy." *Id.* at 132; *see also id.* at 134 (Dr. Dybner-Madero opining that severing Child's bond with foster parents would cause irreparable harm, and returning Child to Mother "would be very harmful"). According to Dr. Dybner-Madero, Child was "adamant" that she wanted to be adopted by foster parents. *Id.* at 130.

The orphans' court aptly summarized Dr. Dybner-Madero's testimony concerning the basis for her opinion that Mother's parental rights should be terminated:

> Dr. Dybner-Madero did not perform a bonding evaluation for Mother and [] Child, although one had been set up by CYS[, and Mother declined to attend]. N.T., 10/29/24, at 135-36. Dr. Dybner-Madero was also going to participate in a mediation meeting[ (that Mother declined to attend),] which was scheduled for September of 2024. Dr. Dybner-Madero acknowledged that the purpose of that meeting was for [] Child to communicate her feelings toward [M]other[,] and would not focus on resolution or reunification. *Id.* at 146. Dr. Dybner-Madero was also not provided with any information about Mother's progress in rectifying the circumstances which resulted [i]n CYS's involvement. *Id.* at 148. Dr. Dybner-Madero did not have any information [regarding] Mother's current mental health condition or her ability to parent. *Id.* at 156. Dr. Dybner-Madero's opinion was based primarily on [] Child's expressed feelings that Child did not feel emotionally safe going back to live with Mother. *Id.* at 162-63.

Decree, 10/10/25, at 9 (some citations modified; numbering and paragraph breaks omitted).

Child testified consistently with Dr. Mechanick's and Dr. Dybner-Madero's observations regarding Child's bond with foster parents. *See* N.T., 10/29/24, at 254-55.

Concerning visitation with Mother, Child testified,

I don't really want visits.  I know I did say [] in a previous court meeting that I wanted visits, but I only … want visits in order to make the process of [] adoption go quicker ….  Because honestly, I just want to be adopted and for [] all this to be over.  ….

*Id.* at 259.  Child agreed that she is not "opposed to having visits with [Mother], but … want[s] this whole thing to be over."  *Id.*; *see also id.* at 273 (Child testifying, "I don't think that [being adopted by foster parents would] just make all the issues that I have with [Mother] magically disappear, but … I just want [it] all to be … behind me.").  Child confirmed that her most recent "meaningful conversation" with Mother occurred in September 2021. *Id.* at 271.

Ms. Graham testified that "the child welfare issues, at the time of adjudication, were lack of proper care and control, truancy issues of [S.N.], [and] ongoing mental health issues."  N.T., 4/7/25, at 25.  Ms. Graham testified that, in early 2022, after her discharge from Haven, Mother had supervised visits with Child and additionally communicated with Children through letters and emails.  *Id.* at 32-33.

According to Ms. Graham, in the emails Mother sent to S.A.N. in early 2022, Mother did not accept responsibility for her unfounded claims that Children suffered various medical ailments.  *See id.* at 39 (Ms. Graham reading into the record a portion of an email Mother sent to S.A.N., wherein Mother stated, "I do not understand[] why you and [Child] would make up such terrible things about [Mother,] unless you both were so angry about my

not telling you the truth of your origin[ (*i.e.*, the fact that Children were conceived through IVF)]."); ***id.*** at 41 (Ms. Graham describing an email to S.A.N., wherein Mother stated, "At some point, you hatched a plan with the help of an adult to convince me that you were all sick with a mystery disease. I was broken with the news."). ***But see id.*** at 86 (Ms. Graham agreeing that, in a February 2022 email to S.A.N., Mother acknowledged that she had not been a "perfect mom").

Ms. Graham testified that, for a period of approximately six weeks, beginning in March 2022, Mother stopped communicating with CYS. ***Id.*** at 43; ***see also id.*** at 97 (Ms. Graham testifying that this was the only period during which CYS was unable to contact Mother). Ms. Graham explained that CYS regained contact with Mother after this period, and supervised visitation with Child continued until Child's refusal to participate in visits in July 2022. ***Id.*** at 45.

Ms. Graham explained that CYS attempted to arrange family therapy for Child and Mother, but was unsuccessful. ***Id.*** at 46-47; ***see also id.*** at 47 (Ms. Graham testifying that CYS contacted "about 20 different providers," but "[t]hey either had a long wait[]list or they did not accept the insurance.").

Ms. Graham testified that, ultimately, Mother found a family therapist, and a session with Mother and Child was scheduled for April 2023. ***Id.*** at 54. Ms. Graham testified that CYS asked Child whether she wanted to attend, and Child declined. ***Id.*** Ms. Graham testified that Child "was asked at every home

visit" thereafter whether she wanted to attend family therapy with Mother; Child "consistently declined." *Id.*

Ms. Graham explained that in the summer of 2024, Child agreed to participate in "a mediation session" with Mother, which Mother declined. *Id.* at 56. Ms. Graham testified that CYS also arranged a bonding evaluation with Dr. Dybner-Madero, scheduled for June 27, 2024, but Attorney Gilston advised Ms. Graham that "it would not benefit [Mother] to do a bonding evaluation at this stage of the case." *Id.*; *see also id.* at 180 (Mother testifying that she did not attend the bonding evaluation with Child, because "if you don't see a child for years, if there's no communication, what kind of bond can there be?").[10]

Ms. Graham testified that Attorney Gilston and Mother declined mediation with Child, because they did not accept Child's stipulation that Ms. Graham or Dr. Dybner-Madero be present for the session. *Id.* at 56. According to Ms. Graham, Mother suggested that family therapist Reese Jepson (Dr. Jepson) be present for the mediation session, but both Child and CYS rejected Mother's proposal. *Id.* at 58; *see also id.* (Ms. Graham opining that, in her experience, "D[r.] Jepson[] has acted more in the role of a legal [c]ounsel instead of a mental health professional[,]" based on Dr. Jepson's

---

[10] We observe that the bonding evaluation was scheduled to occur two days after the date Child filed the instant TPR petition.

prior communication to CYS "speaking of [Mother's] reunification[ with Child], but that's not what [Child] want[s].").[11]

Concerning any remaining "child welfare" issues for Mother to address, Ms. Graham testified that the only goal for Mother to achieve is "the mental health component[,]" *i.e.*, Child's "mental health[, a]nd Mother's ongoing mental health." *Id.* at 69. Ms. Graham opined that CYS "did everything … we could have possibly done" to persuade Child to attend visitations and family therapy with Mother. *Id.* at 71. Ms. Graham testified, however, that CYS "can't force a child to do anything." *Id.*

On cross-examination, Ms. Graham confirmed that Mother completed the PACT program; maintained contact with CYS; enrolled in mental health treatment; attended supervised visitations at Elwyn; and located an individual and family therapist for Child, for which Mother paid out-of-pocket. *Id.* at 87-94. Ms. Graham testified that Mother "had done everything [CYS] asked her to do." *Id.* at 118. Ms. Graham additionally acknowledged that, although CYS concluded Mother failed to recognize the trauma Child experienced prior to her placement, CYS did not disclose to Mother the reason that Child began

---

[11] Although CYS offered Mother a bonding evaluation and mediation session with Child, Ms. Graham opined that neither "would have helped [Mother] to establish a relationship[ with Child]. But I think that it would have been beneficial to help [Child] ease her mind and let [Child] speak her peace to [Mother]." N.T., 4/7/25, at 72-73; *see also id.* at 74 (Ms. Graham testifying that the purpose of the bonding evaluation and mediation session was not to work towards reunification of Mother and Child, but to provide a forum for Child to express her thoughts to Mother and to progress towards adoption).

declining visitation with Mother. *Id.* at 98-99; *see also id.* at 98 (Ms. Graham agreeing that CYS took the position that, because Child was represented by counsel, Child was not required to disclose why she declined visitation with Mother).

Ms. Graham testified that in 2023, S.N. and Mother participated in family therapy, began unsupervised visitation, and, eventually, S.N. and Mother were reunified. *Id.* at 107, 111; *see also id.* at 113 (Ms. Graham testifying that S.N.'s dependency case was closed in February 2024). According to Ms. Graham, CYS "thought it was safe to reunify" S.N. and Mother. *Id.* at 156.

Mother testified that the September 2021 incident precipitating law enforcement's wellness check occurred when she was "really confused" and "very depressed." *Id.* at 186. Mother explained that she was "having some difficulties at that time," and leaving Children alone "was a very wrong decision." *Id.* at 187. Mother acknowledged her need for mental health treatment and testified that, after being discharged from Haven, she has "had nonstop therapy since October or November of [20]21." *Id.* at 175. Mother testified that, in August 2024, her therapist reduced Mother's sessions to less frequent "maintenance therapy[,]" which she has continued to attend. *Id.*; *see also* N.T., 5/15/25, at 65 (Child stipulating that Mother has made progress in her mental health treatment, and "no longer requires frequent sessions").

Mother testified that, in addition to visitations, she and Child communicated via text messages in 2021 (until Child's electronic device was taken by foster parents or CYS), wherein Child expressed her desire to reunify with Mother.   N.T., 4/7/25, at 203; *see also* Mother's Exhibit 2 (text messages); N.T., 4/7/25, at 207, 209-10 (Child stipulating that "in the very beginning of this case… [Child] was actively stating that she wanted to return home"; CYS joining Child's stipulation).

Mother testified that, despite her queries, CYS never informed her why Child declined visitation with her.  *Id.* at 173-74 (Mother detailing her efforts to learn the reason Child "abruptly" refused visitations); *see also* N.T., 5/15/25, at 78 (Mother testifying regarding her suspicion that foster parents influenced Child's decision to decline visitation with Mother); *id.* at 115 (S.N. testifying that foster parents did not encourage Child to attend visitation with Mother).  According to Mother, throughout the life of Child's dependency case, she sent CYS numerous emails and text messages regarding various issues, but "there really wasn't much contact" from CYS.  N.T., 4/7/25, at 189, 198; *see also id.* at 217 (Mother claiming she received "no support from CYS whatsoever.").

Concerning her efforts to secure family and individual therapists for Children, Mother testified that she "must have contacted 45" therapists.  *Id.* at 197.  Mother explained that when she found a family therapist (Dr. Jepson),

she paid out of pocket, and only S.N. attended sessions with Mother. *Id.* at 200.

Mother agreed that she was "ready, willing, and able to parent [Child]." *Id.* at 228. Mother acknowledged, however, that at the time of the TPR hearing, Mother had "no relationship with [Child, and Child] couldn't go home with [Mother.]" *Id.* at 263; *see* N.T., 5/15/25, at 68 (Mother clarifying that she and Child would first "need therapy and visitation."); *id.* at 100 (Mother confirming that, "[i]f [Child] was willing to come home today," Mother would take Child home).

At the conclusion of the TPR hearing, the orphans' court took the matter under advisement. On October 10, 2025, the orphans' court issued a decree denying Child's petition. Child filed a timely notice of appeal and contemporaneous Pa.R.A.P. 1925(a)(2)(i) concise statement. On December 8, 2025, the orphans' court filed a Rule 1925 opinion, which primarily directed this Court to the analysis set forth in its decree.

Child raises the following issues:

A) Did the [orphans' c]ourt err in denying the [TPR] petition, by concluding without evidence, the conditions which led to the removal or placement of [C]hild no longer exist[,] in that:

a. Mother had properly addressed her mental health problems; and

b. [Mother] had acknowledged and addressed her mental health problems, specifically how her mental health had caused [C]hild's trauma, despite the contradictory testimony of Dr. Mechanick, [Ms.] Graham, and [M]other []?

B) Did the [orphans'] court abuse its discretion and err as a matter of law in concluding that the statutory requirements under [Section] 2511(a)(2) were not met[,] when sufficient evidence supports the argument that Mother fails to recognize that her longstanding mental health issues have contributed to the trauma and harm she has caused [C]hildren?

C) Did the [orphans'] court abuse its discretion and err as a matter of law in concluding that the statutory requirements under [Section] 2511(a)(8) were not met[,] when sufficient evidence supports the argument that [M]other had not remedied the conditions that le[]d to placement and [C]hild's best needs would be served by termination of parental rights?

D) Did the [orphans'] court abuse its discretion and/or err as a matter of law by dismissing the conclusion of the professionals without sufficient evidence to contradict their conclusions?

E) Did the [orphans'] court abuse its discretion and err as a matter of law in concluding that [Child] can be reunited with [M]other because [S.N.] was reunited and residing with [Mother]?

F) Did the [orphans'] court abuse its discretion and err as a matter of law in concluding that [Child] can be reunited with [M]other because [S.N.] was reunited[,] when [Mother's] parental rights were terminated to [S.A.N.]?

G) Did the [orphans'] court abuse its discretion and err as a matter of law by failing to give primary consideration to the developmental, physical[,] and emotional needs and welfare of [C]hild as required by [Section] 2511(b)[?]

Child's Brief at 7-9 (issues reordered).[12]

We review an orphans' court's denial of a termination of parental rights petition for an abuse of discretion. *See Interest of M.K.L.*, 354 A.3d 42, 59 (Pa. Super. 2026). This standard of review requires appellate courts to

_____

[12] Child abandoned her claim that the orphans' court erred in concluding that termination was not merited pursuant to Section 2511(a)(5).

- 20 -

accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

As the Pennsylvania Supreme Court discussed in *In re: R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010), there are clear reasons for applying an abuse of discretion standard of review…. Unlike trial courts, appellate courts are not equipped to make fact-specific determinations on a cold record, where trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, **even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment**; instead, we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*Interest of K.T.*, 324 A.3d 49, 56 (Pa. Super. 2024) (brackets omitted; emphasis added) (quoting *In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012)); *see also In re Adoption of C.P.D.*, 324 A.3d 11, 24 (Pa. Super. 2024) ("[T]he trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by the finder of fact." (citation and brackets omitted)); *In re P.Z.*, 113 A.3d 840, 849 (Pa. Super. 2015) (observing that, in termination cases, an abuse of discretion "is a highly deferential standard and, to the extent that the record

supports the court's decision, we must affirm even though evidence exists that would support a contrary result." (citation omitted)).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis:

> "Courts must begin by first considering whether a parent's conduct warrants termination under [S]ection 2511(a) prior to shifting its focus to whether termination best serves the child's needs and welfare." *In re Adoption of G.W.*, 342 A.3d 68, 83 (Pa. Super. 2025) (*en banc*). The petitioner only needs to prove one of the eleven distinct grounds under subsection (a) to shift the focus to [S]ection 2511(b), which then requires the court to determine whether termination serves the child's developmental, physical, and emotional needs and welfare. *In re K.R.*, 200 A.3d 969, 979 (Pa. Super. 2018) (*en banc*). The party seeking termination must prove the elements of [S]ection 2511 by clear and convincing evidence, which is evidence that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Matter of Adoption of L.C.J.W.*, 311 A.3d 41, 48-49 (Pa. Super. 2024) (citation omitted).

*Interest of M.K.L.*, 354 A.3d at 60 (some citations modified); *see also Matter of Adoption of L.C.J.W.*, 311 A.3d at 48 ("**Only if** the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [Section] 2511(b)" (citation omitted; emphasis added)); *In re B.L.L.*, 787 A.2d 1007, 1014 (Pa. Super. 2001) ("The needs and welfare of the child are a discrete consideration to be determined only after the statutory requirements for termination have been met.").

Instantly, we consider Child's first three issues together, as they are related.[13] In these issues, Child challenges the orphans' court's determination that Child failed to prove termination of Mother's parental rights was warranted under Section 2511(a)(2) and (8). Child primarily focuses her analysis on the orphans' court's purportedly erroneous conclusion that Mother "had properly addressed her mental health problems," and "acknowledged her role in [] Child's trauma." Child's Brief at 22, 27. To the contrary, Child argues, "there was no evidence presented … that [Mother] fully comprehends the psychotic nature of her mental illness," or that Mother accepted that her mental illness traumatized Child. *Id.* at 26, 30.

Regarding Section 2511(a)(2), Child briefly argues that she provided "ample evidence … to demonstrate [M]other's inability to recognize [Child's] emotional trauma …. Therefore, [Child] continues to be without essential parental care for her mental wellbeing[,] and Mother's refusal to accept her role [in causing Child's trauma constitutes a parental incapacity that] will not be remedied." *Id.* at 50-51.

Regarding Section 2511(a)(8), Child argues that the orphans' court improperly considered Mother's "willingness or ability to remedy the conditions

_____

[13] Child's first issue, wherein she claims the orphans' court erroneously determined that Mother addressed her mental health issues and acknowledged the trauma she caused Child, largely forms the basis for her claims that the orphans' court erred in refusing to terminate Mother's parental rights pursuant to Section 2511(a)(2) and (8).

which led to the removal" of Child, rather than determining whether "the conditions continue to exist and that reunification is not imminent at the time of the [TPR] hearing." *Id.* at 37. *But see id.* at 7 (Child acknowledging the orphans' court concluded that "the conditions which led to [Child's] removal or placement … no longer exist …."). According to Child, "although Mother was in full compliance in meeting CYS's objectives, she ultimately failed to make the progress necessary for reunification and [to] provide proper care and control to Child," as Mother "lacked the understanding necessary to provide for the emotional and mental needs" of Child. *Id.* at 38-39.

In support of her position that Mother failed "to acknowledge her role in Child's trauma," Child cites Mother's testimony that she (1) did not know the extent of Child's trauma; (2) believed that Child "fak[ed]" some symptoms "because [Child] didn't want to go to school"; (3) did not believe that Child could return home with Mother at the time of the TPR hearing; and (4) did not believe "therapy can work if [parental] alienation continues." *Id.* at 40-43 (quoting N.T., 4/7/25, at 255, 263, and N.T., 5/15/25, at 83, 86-87, 99).

Mother contests Child's claim that her alleged lack of understanding of Child's trauma was a basis upon which Child was removed from Mother's care. Mother's Brief at 29. Mother points out that "[t]here was nothing in [Child's dependency order] that required [] Child to participate in mental health therapy, or trauma therapy. The only mental health directive was for Mother to participate in mental health treatment." *Id.* (record citation omitted).

According to Mother,

Mother's mental health was one reason for removing [C]hildren from her home, not the alleged mental health of any of [C]hildren. The record is clear that Mother was never told by CYS why [] Child was refusing to visit her, or why [] Child would not participate in family therapy. Mother accomplished everything that was asked of her by the [orphans' c]ourt, and took responsibility for her previous actions.

*Id.*

Section 2511(a)(2) and (8) of the Adoption Act provides as follows:

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

….

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

….

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. § 2511(a)(2), (8).

To satisfy Section 2511(a)(2), the petitioner must prove "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental

- 25 -

care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." ***In Int. of D.F.***, 165 A.3d 960, 967 (Pa. Super. 2017) (citation and brackets omitted). "The grounds for termination are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied." ***In re Adoption of A.H.***, 247 A.3d 439, 443 (Pa. Super. 2021) (citation omitted). "In reviewing the [trial] court's findings pursuant to [S]ection 2511(a)(2), we remain mindful that parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." ***Interest of Z.N.B.***, 327 A.3d 241, 249 (Pa. Super. 2024) (citation, quotations marks, and brackets omitted).

To satisfy Section 2511(a)(8), the petitioner must prove that

> (1) the child has been removed from the parent's care for at least 12 months; (2) the conditions which led to the removal or placement still exist;[14] and (3) termination of parental rights would best serve the needs and welfare of the child. Section 2511(a)(8) does not necessitate an evaluation of a parent's willingness or ability to remedy the conditions that led to the removal of the child. Rather, our inquiry is focused upon whether the at-issue conditions have been remedied such that reunification of parent and child is **imminent** at the time of the hearing.

_____

[14] Here, the orphans' court's decree denying termination is divided into three sections: findings of fact, "discussion," and conclusions of law. ***See generally*** Decree, 10/10/25. In its conclusions of law, under a section titled "Termination under [Section] 2511(a)[](8)," the orphans' court misstates the second element of Section 2511(a)(8), opining that "[t]he facts do not [evidence Mother's] … inability or refusal to meet her parental obligations…." ***Id.*** at 23. However, elsewhere in its conclusions of law, and in its "discussion," the orphans' court determined that Mother had remedied the conditions necessitating Child's placement. ***See id.*** at 14, 21.

- 26 -

*In re E.J.C.*, 335 A.3d 1222, 1230-31 (Pa. Super. 2025) (citations and quotation marks omitted; footnote added; emphasis in original).

In considering Section 2511(a)(8), we have observed that "a parent's progress toward remedying the conditions [necessitating her child's placement] is insufficient, as a matter of law, to warrant a finding in favor of the parent under the second prong of [Section 2511](a)(8)." *In re Adoption of G.W.*, 342 A.3d at 87 (citing *In re R.J.S.*, 901 A.2d 502, 512 (Pa. Super. 2006)). Moreover, Section 2511(a)(8) does not "require an evaluation of the availability or efficacy of [a child protective services agency's] services." *Id.* at 88 (citation omitted).

Regarding Section 2511(a)(8)'s third element, we have explained that,

> while both Section 2511(a)(8) and Section 2511(b) direct us to evaluate the "needs and welfare of the child," we are required to resolve the analysis relative to Section 2511(a)(8), prior to addressing the "needs and welfare" of the child, as proscribed by Section 2511(b); as such, they are distinct in that we must address Section 2511(a) before reaching Section 2511(b).

*In re E.J.C.*, 335 A.3d at 1231 (brackets omitted) (quoting *In re Adoption of C.L.G.*, 956 A.2d at 1009).[15]

Instantly, the orphans' court denied Child's petition to terminate Mother's parental rights pursuant to Section 2511(a)(2) and (8), based upon its finding that "Mother, who has no burden of proof, has shown that the

---

[15] The orphans' court in this case did not proceed to Section 2511(a)(8)'s or (b)'s needs and welfare analysis, as it concluded that Child failed to carry her burden with respect to Section 2511(a)(8)'s second element.

original conditions and causes of [her] incapacity, abuse, neglect or refusal have been remedied." Decree, 10/10/25, at 21. The orphans' court enumerated the following findings supporting its conclusion:

27. Mother acknowledged her decision to leave [C]hildren alone at home[ in September 2021,] and go to a motel[,] was wrong and prompted by her mental health condition at the time. N.T., 4/7/25, at 187.

28. Mother recognized that she needed mental health treatment and checked herself into Haven … on September 23, 2021. She was discharged from Haven on October 4, 2021. *Id.* at 188.

29. Mother began individual therapy [] immediately upon her release from Haven and has consistently been with the same therapist. At the time of the [TPR] hearing[] …, Mother only needed to see her therapist for maintenance visits. *Id.* at 188-89.

30. Mother maintained consistent contact with CYS except for a 6-week period in March 2022[,] when she had learned that [] Child wanted reduced visitation.

31. Mother renovated her home and improved its cleanliness and overall condition. *Id.* at 189, 213-14; Mother's Exhibit 1(a)-(q).

32. Mother completed [PACT]. N.T., 4/7/25, at 189.

33. Mother did not willfully miss any visitations at Elwyn. [] Child began to refuse visitation in [the] Summer of 2022. Mother asked CYS for an explanation, but she did not receive one. *Id.* at 196.

34. Mother sought out family therapists on her own when CYS was having problems finding one. After she found a family therapist, Mother paid for his services out of her own pocket. Mother also found individual therapy for [C]hildren. *Id.* at 198-99.

35. Besides the parental classes and the supervised visitation, CYS did not offer any additional services to Mother. Mother felt that CYS failed to communicate with her about many aspects of the reunification process[,] and she felt blindsided when, in her

view, [] Child seemed to [suddenly] change her mind about visitation with her. *Id.* at 225-27.

36. Mother declined [to participate in] the [June 2024] bonding evaluation because her attorney at the time advised her not to attend. *Id.* at 221.

37. Mother's decision in this regard did not reflect an unwillingness to attend to [] Child[,] but reflected respect for counsel's advice.

38. Mother did not attend the mediation session with Dr. Dybner-Madero because [Mother] felt uncomfortable due to her confusion about the purpose of the meeting and her lack of input in its goals and arrangement. *Id.* at 222-23.

39. These decisions do not minimize Mother's regard for her relationship with [] Child, but seemingly emanate from uncertainties about the process.

Decree, 10/10/25, at 6-7 (some citations modified).

Addressing Child's Section 2511(a)(2) and (8) claims together, the orphans' court reasoned as follows:

Mother has not engaged in affirmative misconduct nor acts of refusal. On the contrary, **at almost every step, [Mother] has shown a concrete desire to recommit to her parental duties**. [Child] argue[s] that Mother has shown an incapacity to perform parental duties due to her inability to address Child's prior trauma, in which Mother played a part. This court might be more inclined to agree with [Child] if [she] established that Mother had refused to acknowledge her role in Child's trauma. However, the evidence preponderates to the contrary. Mother had a mental breakdown, which she purposefully recognized and addressed through ongoing treatment, medication and therapy, for the most part on her own and without CYS involvement. Mother sought treatment for [] Child and, at some points, was paying for it out of her pocket. Mother consistently communicated with CYS about [] Child's distancing herself from Mother and was not given reassurances or answers. Indeed, Mother had lapses and made mistakes. She has "owned" her miscues and has taken

responsibility by properly addressing them and attempting to secure help for [] Child.

In contrast, the apparent primary motivation for [Child's] petition finds it[s] source in [] Child's articulated feelings. While that inspiration is understandable, it does not meet the legal litmus test. This court cannot base its decision solely on [] Child's stated feelings and preferences. [**See In re B.L.L.**, 787 A.2d at 1014 ("[T]he preference of the child, reviewable in a custody proceeding, and [her] right to be heard on the record, is not relevant to termination proceedings, as the child is not electing a choice between two otherwise fit parents with whom [s]he will be able to be placed.").]

The current situation poses a most difficult conundrum in that **Mother has assiduously addressed the problems that created the dependency situation. Mother has shown that she has addressed her issues**[,] **particularly in light of her apparent current ability to maintain care and custody of** [**S.N.**] …. [Mother] has proven both the desire and ability to alleviate the circumstances that resulted in [Child's] placement. Her efforts were sufficient to allow a resumption of Mother's custody of … S.N. Even so, Mother's corrective actions took time, and during that time, Child has apparently grown attached to [] foster parents. … Child's … preference [merits] consideration. So too, does the absence of evidence that Child's … preference is immutable. [**See** N.T., 10/29/24, at 259 (Child agreeing that she is not "opposed to having visits with [Mother], but … want[s] this whole thing to be over.").] Under any circumstances, the law's bifurcated process does not offer any child [the] ultimate decision-making power.

….

After hearing … testimony[,] the court gained a fuller recognition of Mother's efforts and commitment to resume her full role as parent to [Child]. While reunification with Child may not occur overnight, the fundamental understanding that a parent should have an opportunity to restart her relationship where the statutory factors [under Section 2511(a)] have not been met requires the court to [deny Child's TPR petition].

The court considered the law and the evidence, weighing carefully often countervailing factors. [**See**] **In the Interest of**

> ***S.K.L.R.***, … 256 A.3d 1108, 1124 ([Pa. ]2021) (recogni[zing] that parental termination proceedings may involve "close calls based on fact-specific determinations"). …. Here, [Child's] efforts, while well-meaning, fall well short of the requisite evidence to [terminate] Mother's [parental rights].

***Id.*** at 14-16 (emphasis added); ***see also id.*** at 10 (the orphans' court opining that, "[b]ut for Child's resistance, Mother's present situation would allow her to properly and meaningfully assume responsibility for the care and control of Child.").

The orphans' court's factual findings are supported by the record, and its conclusions are free of legal error. ***See Interest of K.T.***, 324 A.3d at 56 (stating that "an appellate court must … defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion." (citation omitted)); ***see also In re P.Z.***, 113 A.3d at 849 ("[T]o the extent that the record supports the court's decision, we must affirm even though evidence exists that would support a contrary result." (citation omitted)).

Regarding the third element of Section 2511(a)(2), the record supports the orphans' court's conclusion that Mother remedied her parental incapacity. As outlined above, Mother acknowledged her need for mental health treatment;[16] continuously engaged in therapy sessions, beginning in 2021;

_____

[16] We note that while Child emphasizes Mother's failure to acknowledge the "psychotic nature of her mental illness," Child's Brief at 26, Child's own expert (Dr. Mechanick) did not opine that Mother exhibited psychotic symptoms at
*(Footnote Continued Next Page)*

completed the PACT program; and attended supervised visits with Child, as offered by CYS.  To the extent Child claims Mother is unable to remedy her parental incapacity because she has failed "to recognize [Child's] emotional trauma and response to living [] with Mother," we observe that, by Ms. Graham's own admission, CYS refused to advise Mother of the reason Child discontinued visitation with Mother.  ***See*** N.T., 4/7/25, at 98-99.  In any event, Mother's persistence in seeking (and securing) an individual and family therapist for Child evidenced her appreciation of Child's trauma.

The record likewise supports the orphans' court's determination, concerning the second element of Section 2511(a)(8), that the conditions that necessitated Child's initial placement no longer exist.  Ms. Graham testified that the "child welfare issues, at the time of [Child's dependency] adjudication, were lack of proper care and control, truancy issues of [C]hild, ongoing mental health issues.  These were for [Mother]."  N.T., 4/7/25, at 25; ***see also id.*** at 27 (Ms. Graham identifying "[**Mother's**] unaddressed mental health issues" as a condition that led to Child's placement (emphasis added)).  ***But see id.*** at 68-69 (Ms. Graham testifying that "the only child welfare issue that exist[ed,]" at the time of the TPR hearing, was "the mental health component. … [Child's] mental health[, and Mother's] ongoing mental health.").

_____

the time of her psychiatric evaluation.  ***See*** GAL Exhibit 7(b) at 11 (Dr. Mechanick diagnosing Mother with "major depression, **single episode**, in partial remission" (emphasis added)).  Child proffered no evidence suggesting that Mother continues to suffer from psychosis.

Although Ms. Graham testified that that the only remaining child welfare issues were Mother's **and** Child's mental health issues, it is apparent from the record that concern for Child's mental health was **not** an initial condition leading to Child's removal from Mother's home. Child was placed into protective custody after Mother's mental health episode caused her to leave Children unattended. Mother was admitted to a psychiatric hospital, and the orphans' court subsequently ordered **Mother** to submit to a mental health evaluation and comply with recommended treatment. **See** Dependency Order, 12/14/21, at 3.

As the record supports the orphans' court's determination that Mother satisfactorily addressed her mental health goal (as well as all of her other goals), we agree that the conditions leading to Child's placement no longer exist. **See Interest of R.R.D.**, 300 A.3d 1077, 1082 (Pa. Super. 2023) (reversing the trial court's order terminating parents' parental rights, where the parents had remedied the initial cause of the placement (inadequate housing), despite the father's "nonengagement" with the children and the mother's "incapacity and/or inability to parent"; emphasizing that "[a] plain reading of [Section 2511(a)(8)] requires that 'the conditions which **led** to the removal or placement … **continue** to exist.'" (quoting 25 Pa.C.S.A. § 2511(a)(8); emphasis in original)).

Based upon the foregoing, Child's first, second, and third issues merit no relief.[17]

In her fourth issue, Child argues the orphans' court erred "by failing to give the proper weight" to Dr. Mechanick's, Dr. Dybner-Madero's, and Ms. Graham's conclusions that Mother's parental rights should be terminated, and Child should remain with foster parents. Child's Brief at 31. According to Child, the orphans' court "simply state[d its] observations of [M]other and [C]hild[,] and offer[ed] no evidentiary basis to contradict or undermine the conclusions of the professionals." *Id.* Child faults the orphans' court for purportedly "disregard[ing] the impact [] Mother's behaviors have had on [C]hild, and [C]hild's own mental health diagnosis of anxiety, etc." *Id.*

Our Supreme Court has instructed that,

> [b]ecause trial courts are on the front lines assessing the credibility of witnesses and weighing competing and often challenging evidence, it is paramount that, in reviewing trial courts' decisions in this arena[, *i.e.*, termination of parental rights cases], appellate courts defer to trial courts' first-hand observations as they relate to factual determinations. In this regard, we reiterate that appellate courts must review such decisions for an abuse of discretion or error of law, and appellate courts may reverse trial courts only when that discretion has been breached or when the law has been misapplied. In other words, an appellate court should review the certified record to decide whether it supports the trial court's order, regardless of whether the appellate court agrees with the result that the trial court reached.

---

[17] Because we conclude the orphans' court did not err in its Section 2511(a) analysis, we do not address Child's seventh issue, concerning Section 2511(b). *See Matter of Adoption of L.C.J.W.*, 311 A.3d at 48.

***Int. of S.K.L.R.***, 256 A.3d at 1129.

> Regarding expert testimony, we have observed that
>
> [t]he trier of fact is not bound by the testimony of any expert witness and is under no obligation to accept the conclusions of an expert witness. However, while a trial court is not required to accept the conclusions of an expert witness, it must consider them, and if the trial court chooses not to follow the expert's recommendations, its independent decision must be supported by competent evidence of record.

***Interest of S.A.S.***, 305 A.3d 1039, 1049 (Pa. Super. 2023) (citations, quotation marks, and ellipsis omitted); ***see also Linde v. Linde***, 220 A.3d 1119, 1151 (Pa. Super. 2019) ("Where the trial court sits as the finder of fact, it has discretion to accept or reject a witness'[s] testimony, including that of an expert witness, and is free to believe all, part, or none of the evidence presented." (quotation marks and citation omitted)); ***King v. King***, 889 A.2d 630, 632 (Pa. Super. 2003) (in a child custody case, stating that "[w]hen expert evaluation is uncontradicted or unqualified, a [trial] court abuses its fact[]finding discretion if it **totally discounts expert evaluation**. … So long as the trial court's conclusions are founded in the record[,] the lower court [is] not obligated to accept the conclusions of experts." (citation omitted; emphasis added)).

Instantly, the orphans' court detailed, at length, the testimony and conclusions of Dr. Mechanick and Dr. Dybner-Madero. ***See*** Decree, 10/10/25, at 7-10. Ultimately, the orphans' court concluded that,

> [w]hile the court recognizes the expertise of both Dr. Mechanick and Dr. Dybner-Madero, the court's observations of Mother and []

Child leave room for doubting some of their professional opinions[,] and provide optimism that Mother, with proper reunification assistance, may be able to resurrect her bond with [] Child[,] just as … S.N.[] has reconnected and resumed her relationship with Mother.

*Id.* at 10.

Upon review, and mindful of the deference owed to orphans' courts in assessing the weight and credibility of expert testimony, we discern no abuse of the orphans' court's discretion in the weight it assigned to the opinions proffered by Child's experts. **See S.K.L.R.**, 256 A.3d at 1129; **Interest of S.A.S.**, 305 A.3d at 1049. The orphans' court plainly considered Child's expert testimony, **see Interest of S.A.S.**, 305 A.3d at 1049, but chose to credit its own assessment of the evidence, and observations of Mother and Child. Moreover, the orphans' court denied Child's TPR petition after finding Mother remedied her parental incapacity and the conditions necessitating Child's treatment. As Dr. Mechanick and Dr. Dybner-Madero both acknowledged they had no information regarding Mother's progress on these matters, their opinions were of minimal value to the orphans' court's Section 2511(a) analysis. **See** N.T., 10/29/24, at 41, 48, 148.

Accordingly, Child's fourth issue entitles her to no relief.

We consider Child's fifth and sixth issues together, as they are related. Child claims the "[orphans'] court erred in concluding that[,] because [S.N. and Mother were] reunited, [Child] could also be[ reunited with Mother,] and

[the orphans' court] failed to fully address the fact that [Mother's] rights were terminated [as to S.A.N.]" Child's Brief at 33.

Child's argument concerning these issues (addressed under the same heading and consisting primarily of block quotes from Dr. Mechanick's testimony), is minimally developed and contains no citation to legal authority. *See id.* at 34-35. Consequently, Mother's fifth and sixth issues are waived. *See In re M.Z.T.M.W.*, 163 A.3d 462, 465 (Pa. Super. 2017) ("[T]his Court will not review a claim unless it is developed in the argument section of an appellant's brief, and supported by citations to relevant authority." (citation omitted)); *see also* Pa.R.A.P. 2119(a).

Even if Child had not waived her fifth and sixth issues, however, they would entitle her to no relief. Child ostensibly faults the orphans' court for favorably weighing evidence of Mother's ability to independently parent S.N., and refusing to weigh against Mother the fact that she voluntarily relinquished her parental rights to S.A.N.

As our Supreme Court has instructed,

[a]ppellate courts reviewing [] fact-bound claims arising in termination matters "should defer to the trial judges who see and hear the parties and can determine the credibility to be placed on each witness and, premised thereon, gauge the likelihood of the success of the current permanency plan[;] and … [e]ven if an appellate court would have made a different conclusion based on the cold record, we are not in a position to reweigh the evidence and the credibility determinations of the trial court." [*S.K.L.R.*, 256 A.3d] at 1124 (quotation marks omitted).

*Int. of K.T.*, 296 A.3d 1085, 1117 (Pa. 2023).

We have stated that "prior terminations are clearly not dispositive of whether parental rights should be terminated in the future[.]" ***In re J.I.R.***, 808 A.2d 934, 939 (Pa. Super. 2002). However, prior **involuntary** terminations "are clearly relevant factors in determining whether a parent's current assertions that [] she is capable of providing proper parental care to the child are credible." ***Id.  But see In re Adoption of Wolfe***, 312 A.2d 793 (Pa. 1973) (where a mother signed a petition to voluntarily relinquish her parental rights to her child, and thereafter elected not to voluntarily relinquish her rights and sought to have the child returned to her, holding that "[a] petition for voluntary relinquishment of parental rights, [] cannot[,] in and of itself[,] support a petition for involuntary termination of parental rights." (citation omitted)).

> Conversely, our Supreme Court has observed that
>
> [t]here is nothing inherent about testimony in a termination case that a parent is competently caring for another child that would render that evidence *per se* irrelevant and inadmissible.  Rather, trial courts in termination cases should utilize the established relevancy test on a case-by-case basis when asked to assess the admissibility of evidence related to a parent's ability to care for a child other than the child who is subject to the termination proceeding.  If the trial court deems the evidence to be relevant, then the evidence should be admitted into the record and the court, as fact[]finder, should assign that evidence the appropriate weight to which it is entitled in reaching its factual and legal conclusions.

***S.K.L.R.***, 256 A.3d at 637-38.

Here, the orphans' court deemed relevant the fact that CYS reunified Mother and S.N., and apparently did not find Mother's voluntary

relinquishment of her rights to S.A.N. a factor worthy of discussion. ***See generally*** Decree, 10/10/25. Our review discloses the orphans' court did not place undue weight on Mother's reunification with S.N. ***See id.*** at 14 (opining that Mother's demonstrated ability to independently care for S.N. provided some evidence that Mother could parent Child). Consequently, we discern no abuse of the orphans' court's discretion in its weighing of these factors, and cannot reweigh the evidence in Child's favor. ***See Int. of K.T.***, 296 A.3d at 1117; ***In re P.Z.***, 113 A.2d at 849. Accordingly, if preserved, Mother's fifth and sixth issues would merit no relief.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 6/9/2026